## Ashton Adoption Case.

Argued April 16, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.
Appeal, No. 149,

reargument refused June 30, 1953.

*G. Levering Arnhold,* with him *A. Benjamin Scirica,* and *Smillie, Bean & Scirica,* for appellant.

*Grover C. Ladner,* with him *John J. Gilbride, Jr.,* and *H. J. Alker, Jr.,* for appellees.

OPINION BY MR. JUSTICE JONES, May 27, 1953:

Richard W. Kubach and Helen R. Kubach, his wife, filed their joint petition in the Orphans' Court of Montgomery County for a decree of adoption of an infant child identified in the petition as Baby Boy Ashton. At a hearing on the petition, the child's natural mother, Mildred Elaine Ashton, who was unmarried, appeared personally and by counsel to protest the adoption. During the progress of the hearing, she filed in the Court of Common Pleas of Montgomery County a petition for a writ of habeas corpus to obtain custody of the child. After the Kubachs had filed an answer to the

petition for habeas corpus, the Court of Common Pleas transferred the proceeding to the Orphans' Court which, by virtue of Section 301 (8) of the Act of August 10, 1951, P. L. 1163, 20 PS §2080.301 (8), Pkt. Part, had exclusive jurisdiction to determine the right to the custody of the child in connection with the proceeding for adoption.

The petition for adoption averred the written and signed consent of the child's mother which was attached to the petition as was also a writing, signed and acknowledged by her, wherein she purported to assign, transfer and set over to ——————— "all my right, title and interest of, in and to a child about to be born to me". The places for the names of the proposed adopting parents in the written consents were likewise blank when the consents were signed by the mother; and such persons were actually unknown to her. The legal inefficacy of the incomplete consents, as well as the so-called assignment, having been properly pronounced by the court during the course of the hearing, counsel for the petitioners in the adoption proceeding sought to rest their claim to a decree of adoption on the alleged abandonment of the child by its mother for a period of over six months in which event, if proven, the mother's consent to the adoption would be unnecessary (see Act of April 4, 1925, P. L. 127, Section 2 (c), as amended by the Act of June 30, 1947, P. L. 1180, 1 PS §2 (c), Pkt. Part). The Orphans' Court ultimately filed an opinion wherein it held that the averments of the adoption petition (treating the mother's alleged abandonment as substituted for the consent pleaded) had been sustained and therewith entered a decree adjudging the child to be the lawful child and heir of the adopting parents to whom, by decree of even date, the custody of the child was awarded. This appeal by the natural mother followed.

The primary question for review is whether the evidence justifies a finding of the mother's abandonment of the child. The learned court below correctly apprehended the legal situation to be as follows: "The only question at issue is, first, whether the natural mother, the only person whose consent could be necessary, has given her consent, and second, if she has not given her consent, and persists in refusing her consent, whether she has abandoned the child, as contemplated by the act, which renders her consent unnecessary. [Paragraph] We can dispose of the consent very quickly, as hereinabove indicated. She has not consented to the adoption of the child and she not only persists in her refusal to consent but actively opposes the adoption. The purported consents appended to the petition are absolutely worthless and of no effect. The only question, therefore, is, as to whether she has abandoned the child, rendering her consent unnecessary."

For a proper appraisal of the mother's attitude toward, and her actions with regard to, the expected child (she never had possession of it in being), a recital of the material findings by the hearing judge as well as other undisputed and corroborated facts of record becomes necessary.

In the summer of 1950, Mildred Elaine Ashton, then twenty-five years old, became acquainted with a man who, representing himself as single, kept company with her. He asked her to marry him and, during what appeared to her to be a courtship, they had sexual relations in August 1950. In the exact words of the hearing judge, the man "turned out to be a deceiver, . . . he at that time was a married man in the process of getting a divorce, and subsequently got a divorce and married another woman." Late August or early September, Miss Ashton suspected that she was pregnant. She confided her secret to her widowed mother with whom

she lived; and, together, they consulted her married sister. The sister advised her to go to a reputable obstetrician whom she named and who had delivered her of her two children. Miss Ashton visited the suggested doctor toward the latter part of September. His examination confirmed that she was pregnant.

The doctor, upon hearing of the circumstances prior to and attending the relations responsible for her enceinte condition, advised her to see an attorney about compelling the father of the unborn child to contribute to the anticipated obstetrical and lying-in expenses. He also counselled her that in her unmarried state it would be less embarrassing to her and better for the child if she would agree in advance of its birth to place it for adoption. He said that he knew a married couple without children of their own who had already obtained a child through him, which they had adopted, and who were desirous of adopting another, and that he thought they would be glad to adopt hers. She told him that she "couldn't see giving the child up for adoption" and would rather keep it herself. The doctor, however, insisted that she should permit it to be adopted. He suggested that "people would talk about [her], and, if [she] did keep the child, no one would marry [her]." As she expressed it,—"He just gave me all the disadvantages." He explained to her that she "couldn't ask any questions as to where the child would go, or the sex of the child, and [she] was to know nothing about it. And, he said he wouldn't handle the case any other way." The doctor freely admitted at the hearing that it was he who proposed adoption for the child. As to an attorney, she told the doctor that she did not have one whereupon he recommended one to her whom she consulted in early October. The attorney's services at that time consisted of the making of an information against the father for fornication and bastardy and the negotiation with the

father's counsel of a money settlement which, incidentally, the father never fully performed.

During the prenatal period, the doctor ascertained that the married couple he had in mind were willing to adopt Miss Ashton's child upon its birth. They agreed with the doctor to pay for his prenatal and postnatal care of her and for all obstetrical and lying-in expenses which were to include a private room for the mother in the Pennsylvania Hospital in Philadelphia. Except for some hearsay from a pediatrician who never saw or talked with the mother, there is nothing in the record to indicate that Miss Ashton had any knowledge of these financial arrangements between the doctor and the Kubachs. She herself paid the doctor ninety dollars. The private room was the doctor's idea in order that the mother could be more conveniently separated at birth from her baby whom it was the doctor's plan she should never see. As he explained in his testimony at the hearing,—"Well, it was a matter of protecting a patient. Unless a patient can go in a private room, they have to be delivered in the ward, and, it is not very pleasant for a girl who has just had a baby, to have babies brought to mothers all around her, and not get one herself. I mean, she could best be protected and be isolated by herself in a private room." The Kubachs also put the doctor in touch with their lawyer to whom the doctor sent the data, concerning the natural parents of the expected child, for future use in an adoption petition and the lawyer in turn sent to the doctor two consents to an adoption and the proposed assignment of the child, all in blank, for Miss Ashton's execution.

When she went to see the doctor the night of April 22, 1951, on one of her regular prenatal visits, he handed her the blank consents and the assignment and instructed her to take them to her attorney (the one he had originally recommended to her, naming him) "to-

morrow morning and have it signed at his office". He said the papers must be signed before she was admitted to the hospital and that she would be going there "within a few days". She took the papers to the attorney's office the next day, as directed, and there, in the attorney's presence, she signed the two consents and the so-called assignment. She acknowledged the assignment before one of his secretaries, who was a notary public, while his other secretary witnessed the signatures to the consents which the attorney dated April 23, 1951. The attorney transmitted the signed consents and the assignment direct to the doctor by mail with a covering letter identifying the enclosures. The record plainly reveals that Miss Ashton signed the consents and the assignment with great reluctance and only after much questioning, but, in the circumstances, she felt compelled to do so. This appears in the cross-examination of Miss Ashton by petitioners' counsel at the hearing: "Q. . . . When [the doctor] told you, just prior to your entry, into the hospital, that you could not go into that hospital unless you executed this particular paper, did you do anything about that? Did you go to your mother? A. Yes, my mother—. Q. What? A. My mother said, suggested that I didn't sign it; she said I didn't have to. Q. What did you tell your mother on that occasion? A. well, I was so upset, and I said, 'Well, he told me it had to be signed before I am admitted to the hospital.'" Four days later (April 27, 1951), she was admitted to the hospital where the following day her baby was born and immediately taken from her. The doctor testified in direct examination by petitioners' counsel as follows,—"Q. She didn't see the baby, then, after it was born? A. No, sir. Q. It was taken away from her immediately then, was it? A. Yes, sir. Q. And she never saw it? A. To my knowledge, no, sir."

After the mother left the hospital the doctor gave her customary postnatal attention, seeing her three or

four times, over a period of approximately six months. He testified that during that time she had no conversation with him nor did she make any inquiry as to the whereabouts of the child. However, as the opinion for the court below states, "She explains this silence on her part 'because he had told me from the beginning that I wasn't to ask any questions about it, and he wouldn't give me any information' and that she thought that she had to abide by that." According to her testimony, she inquired of the doctor concerning the welfare of the child up to her last visit to his office in the latter part of October 1951 and that he had assured her that the child was with a nice family and was being well taken care of. It is not open to dispute that she was intentionally and effectively kept in the dark as to the whereabouts of the child. She asked the attorney if he knew who had the child or where it was and he told her that he did not know. Her continued anxiety for the child and its well-being stands out too clearly in the record to be gainsaid.

It was not until November 24, 1951, when Miss Ashton was served with notice of the hearing (scheduled for December 19th) on the petition for adoption, which had just been filed in court, that she first learned the names of the proposed adopting parents and their residence address. They had maintained and cared for the child from the time it was handed over to them by the doctor following its birth and have since continued so to do until the present time. Miss Ashton has never seen her child except once casually at one of the hearings in court on the adoption petition, the first of which hearings was held on December 19, 1951, and the other on January 8, 1952. Upon receipt of the notice of the adoption hearng, she at once consulted the attorney who had theretofore been representing her. She told him of her desire to have the custody of her child and of her intention to resist the proposed adoption. He endeav-

ored to dissuade her, saying that what had been done was for her own and the child's best interests. When he found that she was adamant in her determination to thwart the adoption and gain possession of the child, he informed her that he could not represent her. Thereupon, in early December, she obtained other counsel who appeared for her at the hearing in the adoption proceeding on December 19th, filed her petition for a writ of habeas corpus for the custody of the child and has since represented her in all phases of the matter.

It is readily apparent from a reading of the material facts that there is bound to be tragedy in this case no matter what the ultimate decision is. The petitioners, who have acted in good faith and have done nothing improper in furthering their desire to adopt another child, have no doubt developed a deep affection for the baby whose care and nurture have been their responsibility for the two years since its birth. Nor are the doctor's motives to be questioned. He undoubtedly acted in what he thought was for the best interest of both the natural mother and the child. There is no reason not to accept at face value his answer to the question, "In doing what you did, Doctor, did you feel that you were acting for the best interests of the child", which was as follows: "I most certainly do. I thought that as I did previously state, that I felt that I was making not only both Elaine [the mother] happy and also the Kubachs happy. And, I certainly felt that it was in the best interests of the child." On the other hand, the sincerity and depth of the mother's desire for her child is equally not open to question. It represents an expression of perhaps the strongest natural instinct known to man which is especially encouraged by and has become highly developed in our civilization. Solomon's sage solution of the celebrated contest of the two women over a child, which each claimed as her own, was reasoned on the basis of the self-sacrificing love for

the child exhibited by the natural mother when both claimants were simultaneously put to the same test. For answer to the problem in this case, our recourse must be to the written law applicable to the circumstances.

Unless the finding by the court below of the mother's abandonment of her child for a period of more than six months is justified by the evidence, the decree of adoption necessarily falls. As already appears, there was no legally valid consent. Not only did the mother not consent but she vigorously resists the adoption. Hence, a justifiable finding of abandonment by her is indispensable to a decree of adoption under the Act of 1925, as amended. And, a finding of abandonment is reviewable on appeal: See *Southard Adoption Case*, 358 Pa. 386, 390-391, 57 A. 2d 904, and cases there cited. While an adoption case comes before an appellate court as on certiorari, it is the reviewing court's duty under the provisions of the Act of April 18, 1919, P. L. 72, 12 PS §1165, to consider the evidence, which is brought up by the certiorari, "with like effect as upon an appeal from a judgment entered upon the verdict of a jury in an action at law." Consequently, "This requires us to examine the testimony [in adoption proceedings] to determine whether there is any evidence to sustain the findings of fact: [citing cases]": *Weinbach's Appeal*, 316 Pa. 333, 337, 175 A. 500; see also *Susko Adoption Case*, 363 Pa. 78, 81, 69 A. 2d 132.

Whether or not a child has been abandoned is a question of fact to be determined from the evidence (*Davies Adoption*, 353 Pa. 579, 587, 46 A. 2d 252) and "is a matter largely of intention": *Hazuka's Case*, 345 Pa. 432, 435, 29 A. 2d 88. Actually, a finding of abandonment is an ultimate conclusion of fact deduced or inferred by reasoning from established facts: *Southard Adoption Case*, supra, at p. 391. Nor may "Such a finding . . . be made arbitrarily. There must be evidence legally sufficient to support it": *Schwab Adoption Case*, 355 Pa.

534, 538, 50 A. 2d 504. And, "Unlike custody cases, in adoption proceedings the welfare of the child is not material until either consent or abandonment as prescribed by the Adoptiton Act has been established": *Susko Adoption Case*, supra. See also *Schwab Adoption Case*, supra, where it was said that "The welfare of the child, as an element in adoption proceedings, has no relation to the question of the parent's abandonment."

The fact that Miss Ashton signed the consents (which proved to be worthless) is some evidence of a willingness at the time to surrender the care and support of her child (*Diana Adoption Case*, 165 Pa. Superior Ct. 12, 15, 67 A. 2d 751), but, standing alone, it is far from being sufficient to establish abandonment. Indeed, in the circumstances of this case, the fact of her signing is devoid of any relevant probative value: cf. *Susko Adoption Case*, supra. As defined in *Schwab Adoption Case*, supra, abandonment "imports any conduct on the part of the parent which evidences a settled purpose to forego all parental duties and relinquishes all parental claim to the child: Weinbach's Appeal, 316 Pa. 333, 175 A. 500", also quoted with approval in *Susko Adoption Case*, supra. Abandonment "requires an intent to escape parental responsibility, and conduct in effectuation of such intent": *Davies Adoption Case*, supra; and *Hazuka's Case*, supra.

There is no evidence in this case of a self-conceived intent on the part of Miss Ashton to escape parental responsibility nor any voluntary conduct on her part to carry out such an intent. From the time she submitted to the obstetrician's care, she gave no indication that she wished to be relieved of the responsibility of the child. On the contrary, her every independent expression was a desire to retain her child. Admittedly, it was the doctor, and not she, who suggested and urged adoption of the child yet to be born. And, while the doctor is not to be censured for his zeal in doing what

he thought was best in the circumstances by accommodating the petitioners, who were seeking another child to adopt, and by relieving the mother from what he thought might prove embarrassing to her in her unmarried station in the rearing of the child, the adoption plan was the doctor's and cannot justly be used to prove wilful abandonment by the mother. The evidence shows that she asked the attorney a number of times prior to the birth of the child whether it would not be possible for her to keep it. He testified at the hearing that her inquiries concerning the possibility of her keeping the child began in early October 1950 when she first consulted him at the instance of the doctor. And, the doctor's testimony shows that he broached the idea of adoption about the time of her first visit to him the end of September or, perhaps, the first part of October 1950. Yet, it was not until four days before her admission to the hospital on April 27, 1951, that she was called upon to execute the consents and assignment, when, as she understood, unless she signed them, she could not enter the hospital for the delivery of her baby or have the obstetrician's further services. The evidence is wholly insufficient to support a finding of abandonment from either intent or conduct on the part of the mother.

In reality, the circumstances of the case did not admit of abandonment by the mother at any time. She never had possession of the child from the moment of its birth and, consequently, had no opportunity to evidence by her conduct, with an alternate choice before her, a settled purpose to forego all parental duties and relinquish all parental claim to the child. No case in this State has been cited, and we know of none, where there has been abandonment by a mother who did not have actual possession of the child at some time or ready access to it and, being so situated, exhibited, by her conduct, an intent to be relieved of her parental

responsibility for which she was willing to surrender her claim to the child. While proven abandonment renders unnecessary the abandoning parent's consent to adoption of a child, the two things are not synonymous and are not to be confused. In the instant case the petitioners' proofs, at best, show no more than that a prenatal arrangement for the adoption of Miss Ashton's child at birth was entered into which appeared to be consensual. It turned out not to be such, however, so far as the mother was concerned; and the formal consent executed by her proved to be legally ineffectual. When that situation developed there was no longer any justification for the proceeding based upon an averment of consent to the adoption by the mother. No amendment of the petition so as to include an averment of abandonment was ever proffered. Nor did the circumstances warrant any such amendment. It is true that petitioners' trial counsel, upon realizing that the written consents were ineffectual, said to the court,—"We are not relying entirely on that. [i.e., consent], because we will prove abandonment". But, that, they not only failed to prove; they were not even in position procedurally to undertake to do so.

: The fact that the procedural requirement for the admission of proofs of abandonment was not followed is not without significance. In *Susko Adoption Case,* supra, we pointed out (p. 82) that ". . . the Adoption Act, as amended June 30, 1947, P. L. 1180, §1 (1 PS 1) provides that where abandonment is alleged, a statement must be attached to the petition for adoption that such abandonment has continued for a period of at least six months". At no time did the petition in this case contain such an averment. How, it may be asked, could anyone competently aver that the mother had persisted in an abandonment of her child for over six months in view of the indisputable facts? For the first seven months of its life, information concerning the child's

whereabouts was sedulously kept from the mother by the only persons who were informed with respect thereto. When she was finally apprised thereof through the medium of the adoption proceeding, she at once took steps to recover the child. In order to find her guilty of abandonment persisted in for a period of more than six months, it would be necessary for those, so claiming, to prove that she had had an opportunity during that period to terminate the alleged abandonment, and thereby retrieve her parental right to the child (cf. *Davies Adoption Case*, supra), but had failed to do so. Manifestly, such proof was impossible in the circumstances of the case.

The learned court below was of the opinion that the case was controlled by the *Diana Adoption Case*, supra, which is materially distinguishable. In the *Diana* case, the unwed mother had actual physical possession of the child. When it was eight days old, the mother, in the company of her brother, took the baby to her doctor to let him place it for adoption with foster parents whom he had selected. At the doctor's office, she signed a consent to the adoption, foreswearing her right to the child. She was prompted to do so by a compelling motive personal to her, namely, that her family had told her that if she brought the child home, "they wouldn't have anything to do with [her]." No such consequential motivation actuated Miss Ashton. Her mother with whom she lived was, and still is, willing for her daughter to bring her child home with her. Mrs. Ashton so testified at the hearing in the adoption proceeding. The court below said that "If there is any dissimilarity whatever between the *Diana* case and this one, it is in the question of her lack of knowledge as to the whereabouts of the child." Obviously, knowledge of the whereabouts of the child is essential to proof of persistence in an abandonment for six months. Moreover, the decision in the *Diana* case cannot be readily reconciled with our

subsequent decision in *Susko Adoption Case,* supra, as a comparison of the two opinions will at once make manifest.

What the court below, in effect, did was to reason from the better financial status of the petitioners that the interests of the child would be best served by its being committed to their custody and control and, from that, the court concluded that a decree of adoption was warranted. The argument is, of course, wholly irrelevant to the question of abandonment as we have already seen. In this case, just as in *Schwab Adoption Case,* supra, the court below mistakenly "gave considerable attention to the desirability of the proposed adoption [and] concluded that the proposed adoption was beneficial to the child. Consideration of what is beneficial for the child is vital in custody cases, but cannot be regarded as evidence of abandonment."

As the decree of adoption cannot be sustained, we come to the question of custody raised by the petition for a writ of habeas corpus. The natural mother has a presumptive right to the care and custody of her child. Beyond that, as found by the court below, "It can not be said . . . that the home of the natural mother would be an unfit place for the child. She and her mother share and maintain a home in Drexel Hill, well located, and, though modest, with every modern convenience conducive to health and comfort." However, the paramount consideration upon a question of custody is the child's best interests: *Commonwealth ex rel. v. Daven,* 298 Pa. 416, 419, 148 A. 524. The court below concluded that the mother could not give the child the advantages and afford him the future security that the petitioners can. That deduction was based solely upon the fact of the petitioners' admittedly better financial position. There is no doubt that they could, in their present circumstances, give the child more material comforts and advantages. But, that is neither a legally nor socially

valid reason for separating children from their parents.

The court further said that "The more important factor is that this child has been with these petitioners practically since birth and the strong tie of parent and child has grown up between them" and that "To uproot it from this home and break this domestic tie would be devastating to its emotional development and hence to its future welfare." There can be little doubt that a change now in the custody of the child, who is two years old, and in its living conditions and environment may have some emotional effect upon it. But, the continued presence of the child in the family of the petitioners has resulted from the inordinate delay in the disposition of the adoption proceeding which cannot justly be charged against the mother. When the adoption proceeding was instituted on November 13, 1951, the child was then but seven months old. The hearing on the petition was concluded a month and a half later on January 8, 1952, but the matter was not argued by counsel and taken under advisement by the court until July 15, 1952, and the court's opinion and decree were not filed until November 15, 1952, in all, a year after the institution of the proceeding. It should have been evident at the conclusion of the hearing that the petitioners had failed to make out a case of abandonment by the mother persisted in for over six months and that, consequently, the petition for adoption would have to be dismissed, the mother not having validly consented thereto. It is to be hoped that any emotional disturbance to the child resulting from the change in its situation because of the order which must necessarily be made in this case will be but temporary and of no serious consequence.

The decree of the court below is reversed at the costs of the appellees and the custody of the child is awarded to the natural mother.