Stone Adoption Case.

Argued November 23, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

*Carl G. Herr,* for appellants.

No argument was made nor brief submitted for appellee.

Opinion by Mr. Justice Benjamin R. Jones, December 30, 1959:

Baby Girl Stone, the child whose adoption is at issue, was born out of wedlock on December 9, 1957 to the then 18 year old Catherine E. Stone in Harrisburg. On October 25, 1957—approximately seven weeks prior to the child's birth—and on December 13, 1957—four days subsequent to the child's birth, the natural mother executed written consents to the child's adoption. On December 15, 1957 the natural mother, upon her discharge from and outside the hospital, delivered the child to a Mrs. Luft, an intermediary. On the same date Mrs. Luft delivered the child to Mr. and Mrs. Harry Weisman, the would-be adoptive parents, and the child from that date to the present—over two years—has been in the custody and care of the Weismans.

On November 13, 1958 the Weismans petitioned the Orphans' Court of Lancaster County for the adoption of this child. Hearings were held at the first of which the mother appeared, withdrew her consents and objected to the adoption of the child. The court below

held that Weismans had failed to prove that the natural mother had abandoned the child and entered a decree refusing the adoption. From this decree the present appeal was taken.

The sole question presented upon this appeal is whether or not the evidence was sufficient to prove an abandonment of this child by her mother. In *Maisels Adoption Case*, 395 Pa. 329, 332, 333, 149 A. 2d 38, we recently stated: "Adoption being a creature of statute, the statute's provisions must be strictly complied with. In the absence of consent of a living natural parent those who seek to adopt a child under the age of eighteen years must prove to the satisfaction of the hearing judge that such natural parent has abandoned the child. 'Abandonment', as defined by the statute [Act of April 4, 1925, P.L. 127, §1, as amended, particularly by the Act of August 26, 1953, P.L. 1411, §1, 1 PS §1 et seq.] is 'conduct on the part of a parent which evidences a settled purpose of relinquishing parental claim to the child and of refusing or failing to perform parental duties' and such conduct must be shown to have continued 'for a period of at least six months' . . . . The scope of our appellate review is clear; even though this appeal is in the nature of certiorari, we must examine the record to determine whether there is legally sufficient evidence to support the court's finding of abandonment: [citing cases]. Chief Justice JONES stated in the Ashton [*Ashton Adoption Case*, 374 Pa. 185, 97 A. 2d 368] case: 'Whether or not a child has been abandoned is a question of fact to be determined from the evidence . . . and "is a matter largely of intention" . . . . Actually, a finding of abandonment is an ultimate conclusion of fact deduced or inferred by reasoning from established facts . . .' ". Under the instant record has Catherine Stone abandoned her child?

On two occasions the natural mother executed consents in writing, once before and once after the child's

birth. The first consent, signed at the behest of a Mr. and Mrs. Luft, intermediaries, and duly notarized, recited that it had been fully explained to the natural mother "that no one can make me give up the child", that the natural mother feels "that it would be better for the child as well as myself, that this child be adopted out and be given a good home", that the natural mother did not "want to know the name or address of the people who get the child or their religious affiliation, as long as the child will be placed in a good home", that if "the child is placed in a Jewish home, as long as the home is a good one, it will be all right with me", that it had been explained to the natural mother that she could go to the Family Welfare Bureau and discuss with them her problem but that "I have made up my mind as to what I want to do and I want to proceed as I am now doing", that the natural mother had talked the matter over with her mother and grandmother who agreed with her and that "I am agreeing to the adoption because I feel that it will be for the best interests of myself and my child". The second consent, also signed at the behest of the intermediaries and duly notarized, recited that the natural mother voluntarily executed the instrument as "her written consent [to the adoption] without the disclosure of the proposed adopters' names or other identification to her and with the full knowledge of the legal effect of such adoption", reiterated her lack of objection to placement of the child in a Jewish home and that the consent was executed by her "because she believes that the said adoption will promote the welfare of her said child". At a hearing before the court below the natural mother testified that she had read both consents before signing them, that she signed them without any compulsion or persuasion, that "I done it on my own" and that she understood when she signed the consents that she was agreeing that "persons unbeknownst to" her might adopt the child. There can not be the slightest

doubt from an examination of the testimony of the natural mother that her consents were intelligently, voluntarily and deliberately given, after consultation with her mother and her grandmother.

Even though the natural mother executed these consents she had the right, which the court below very properly recognized, to withdraw such consents even at the time of hearing: *Susko Adoption Case*, 363 Pa. 78, 83, 69 A. 2d 132. However such consents, if given voluntarily and intelligently, may be considered on the question of abandonment; standing alone such consents are not sufficient to establish abandonment, but they are evidence of a willingness at the time [of the consents] to surrender the care and support of the child: *Ashton Adoption Case*, 374 Pa. 185, 196, 97 A. 2d 368; *Diana Adoption Case*, 165 Pa. Superior Ct. 12, 15, 67 A. 2d 751. The record could not be more persuasive that both before and after the birth of this child the natural mother, with the approbation of both her mother and grandmother, was determined to yield and relinquish her rights to this child and that the would-be adoptive parents accepted this child from her, through the intermediaries, in reliance upon her twice expressed willingness to surrender the care and support of the child.

The natural mother testified that "right after I got out of the hospital", she consulted Attorney Charles Ware of Harrisburg concerning her then existing desire to regain the child and was advised by him that she could not regain her child since she had no husband. Attorney Ware's diary indicated that the natural mother and her mother consulted him on two occasions—January 10 and February 25, 1958—and, according to Attorney Ware, he did not at any time advise the natural mother that it would be impossible for her to regain her child. *The record stands without contradiction that the natural mother made no*

*effort whatsoever to regain the child after her visit to the attorney's office and, under either the testimony of the natural mother or of her attorney, such visitation took place at least nine months prior to the presentation of the adoption petition.*

Mr. Luft, a friend of the Weismans and aware of their desire to adopt a child, learned of the impending birth of this child through an insurance agent who had met Catherine Stone in her aunt's home. He visited the girl in October, 1957 and offered his help to place the child for adoption. Through him execution of both consents was arranged and the child was delivered to his wife by the natural mother outside the hospital. The uncontradicted testimony is that neither Mr. or Mrs. Luft were paid for their services as intermediaries and that the only moneys expended by the Weismans was in connection with the payment of medical and hospital bills in the amount of $373.40. In February 1958 Catherine Stone telephoned Mr. Luft concerning a letter which she had received but of which Mr. Luft was without knowledge; during the course of this conversation "she [Catherine Stone] also asked if she were interested in having her baby back, that she would want to pay the costs, the medical bills, what would they be". There is no evidence that, during the course of this conversation, the natural mother inquired as to the whereabouts of the child, its health or welfare or made any request to regain the child's custody.

An examination of this record indicates that, during a period shortly after the birth of this child, Catherine Stone, the natural mother did seek legal advice concerning the possibility of regaining the custody of this child. What this advice was is the subject of controversy between the natural mother and her counsel. Accepting, arguendo, the version of Catherine Stone, the fact remains that for more than nine months subsequent to the receipt of such advice the natural mother

did absolutely nothing to indicate any interest in this child. It could be argued that she did not know the whereabouts of this child, yet the fact remains that she did know the intermediaries and knew where they, the intermediaries, could be located, as indicated by the February telephone call to Mr. Luft. She could have contacted the intermediaries to ascertain the whereabouts of her child but she did not make any attempt to do so, even under her own testimony.

From February 1958 until November 1958—nine months—the record shows no action on the part of the natural mother evincing any interest whatsoever in her child, its health, its welfare or its whereabouts. Notice of the proposed hearing on the adoption proceeding did produce a belated appearance and some indication of interest on the part of the natural mother. However, the record is clear that for at least a nine months period the natural mother made no overt attempt to evince any interest on her part in the welfare of her child.

The court below would excuse the natural mother's omission to act on the basis of her "immaturity". Granted that the court below had the opportunity to observe the natural mother and draw such a conclusion, the record shows that her conduct was under the supervision of her mother concerning whom the record makes no charge of immaturity. Her mother accompanied her to the attorney's office; it is significant that she was not called upon to testify as to what transpired therein. At the first hearing in this case the natural mother was present and testified; the court at that time notified her of a further hearing several days later and yet she failed to appear. Since the oral argument this Court has received a communication from the natural mother in which she states, inter alia: "I would have been more than glad to help and do all I could for my baby. But they wouldn't even

let me see or know anything about her". The record, however, indicates that the natural mother *could,* had she desired, have ascertained the child's whereabouts through the intermediaries but there is absolutely no evidence that the natural mother made *any* attempt to see or learn of the whereabouts, the health or the welfare of the child.

The court below erred in its conclusion that abandonment had not been established with the required legal certainty. For upwards of six months the conduct of the natural mother evidenced a settled purpose of relinquishing her claim to this child and no attempt on her part to indicate any interest in this child. The language of this Court in *Maisels,* supra, is apposite: ". . . the child's mother permitted petitioners to assume all responsibility for rearing and training [this child] . . ., without any outward or objective indication of the interest a mother should have in her only child and without making any effort to regain the custody of the child so that she might assume the responsibility for the child's welfare".

The court below failed to make any finding on two most important aspects of this matter: first, whether the fact that this child was born of a Protestant mother should preclude its adoption by persons of the Jewish faith under that portion of Section 1 of the Adoption Act, supra, which provides: "Whenever possible, the petitioners shall be of the same religious faith as the natural parents of the child to be adopted"; second, whether the best interests and the welfare of the child would be promoted by this adoption. Before any final conclusion of this proceeding can be reached it is necessary that the court below determine these two important questions.

Decree reversed and the record remanded to the court below to determine whether an adoption should or should not be decreed in consonance with the views expressed in this opinion.