401 A.2d 301

In re ADOPTION OF INFANT MALE M. a/k/a J. P. M.

**Appeal of L. W.**

Supreme Court of Pennsylvania.

Argued March 12, 1979.

Decided May 1, 1979.

78

Frank J. Piatek, Neighborhood Legal Services Assn., New Castle, for appellant.

Charles W. Garbett, Ellwood City, for Lawrence County Child Welfare Services.

No appearance for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

O'BRIEN, Justice.

This appeal arises from a final decree, entered in the Orphans' Court Division of the Court of Common Pleas of Lawrence County, involuntarily terminating the parental

rights of appellant, L. W., in *Infant Male M. a/k/a J. P. M.*
This appeal followed.[1]

The facts surrounding this appeal are as follows: Infant
Male M. was born on July 27, 1976. The mother, B. A. M.,
refused at the time of birth to name the father of the child.
On July 28, 1976, the mother signed a voluntary entrustment
agreement with the Lawrence County Child Welfare Service
(Child Welfare), giving custody of Infant Male M. to Child
Welfare. On August 26, 1976, a petition for voluntary
relinquishment of parental rights was filed by the mother
and joined in by Child Welfare. The mother again refused
to name the father of her child. On September 10, 1976, an
evidentiary hearing was held on the petition of the mother
to voluntarily terminate her parental rights. During the
hearing, the mother named appellant, L. W., as the father of
the child and testified that she did not know the where-
abouts of L. W. The parental rights of the mother were
terminated. Subsequent to September 10, 1976, Child Wel-
fare determined that appellant had been detained at the
Youth Development Center in New Castle, Pennsylvania,
but had escaped from that center.

In February, 1977, Child Welfare discovered that appel-
lant was incarcerated in the Lawrence County Jail. On
March 17, 1977, a case worker from Child Welfare contacted
appellant and informed him that B. A. M. had named him as
the father of Infant Male M. Initially, appellant denied
knowing B. A. M. Later, however, he indicated a desire to
talk to B. A. M. and to an attorney. The caseworker then
informed him of the possibilities of voluntary or involuntary
termination of his parental rights. Appellant then stated
that he wanted to talk to his mother and explore the
possibility that she would care for the child. On March 24,
the caseworker had discussions with appellant's mother con-
cerning an arrangement for her to care for the child. Ap-
pellant's mother subsequently informed Child Welfare that
she would not take care of the child. On March 29, appel-

1. On February 22, 1978, this Court granted appellant's application for
leave to appeal *nunc pro tunc.*

lant called Child Welfare and asked that the caseworker go to the jail. Upon the caseworker's arrival, appellant informed her that he did not want to sign a voluntary relinquishment of his parental rights and that he thought that his mother would take the child. Appellant then indicated that he wanted to talk to his parents again. This was the last contact appellant had with Child Welfare. He never again contacted the agency concerning Infant Male M. and he never inquired as to the well-being of the child nor did he attempt to establish the possibility of visitation with the child.

On August 4, 1977, Child Welfare filed a petition for involuntary termination of the parental rights of appellant. He was served with notice of the petition on August 5, 1977, by the Lawrence County Sheriff. The hearing in the case was originally scheduled for August 31, 1977, but on that date, Child Welfare filed a motion for continuance of the hearing, the reason for the continuance being the illness of the caseworker in charge of this case. On October 4, 1977, Child Welfare filed a motion for a hearing date and the court set November 8, 1977. On that date, both parties agreed to continue the case until December 15, 1977. The joint motion for a continuance indicated that "negotiations between the parties were pending." On December 15, 1977, an evidentiary hearing was held on the petition to terminate appellant's parental rights.

In addition to the testimony of the Child Welfare caseworker, appellant testified at the hearing. He indicated that until March 17, 1977, he was unaware that he was the father of Infant Male M. The child's mother never informed appellant of her pregnancy. Appellant indicated that from February, 1976, and continuing to the time of the hearing, December, 1977, he was either in Forestry Camp near Pittsburgh, the Youth Development Center, New Castle, or the Lawrence County Jail. Appellant further testified that he was informed of his right to contest the petition and was also told the baby was in a foster home. Appellant did testify that the caseworker never informed him of his

right to visit the child. He did admit that he never asked about the well-being of the child because he thought he would soon be released from the Lawrence County Jail and then he could take care of the child.

On December 20, 1977, the court below issued a final decree terminating the parental rights of appellant. This appeal followed.

Appellant makes two related arguments:

I. That the six-month requirement of § 311(1) of the Adoption Act was not complied with at the time of the filing of the petition and, therefore, the Court of Common Pleas of Lawrence County lacked subject matter jurisdiction to hear the case.

II. That the record does not support the court's determination that appellant had a "settled purpose of relinquishing parental claim to a child or has refused or failed to perform duties."

We do not agree with either contention.

## I. Six Month Requirement

On August 4, 1977, Child Welfare filed a petition to involuntarily terminate appellant's parental rights. After two continuances, the hearing was held on December 15, 1977, pursuant to which the court issued a final decree terminating the parental rights. Appellant argues that because he did not know of the birth of Infant Male M. until March 17, 1977, and since the petition was filed on August 4, 1977, less than six months, as required by § 311(1) of the Adoption Act, had passed and that the court of common pleas did not have subject matter jurisdiction. We do not agree.

Section 311(1) of the Adoption Act provides:

"The rights of a parent in regard to a child may be terminated after a petition filed pursuant to section 312, and a hearing held pursuant to section 313, on the ground that:

"(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties . . . ."

The six-month limitation is not a jurisdictional fact which affects the power of the court of common pleas to hear this type of case, but rather is a fact which must be alleged and proved before a court with proper subject matter jurisdiction can grant the necessary relief, i. e., the involuntary termination of parental rights.

We are, therefore, of the opinion that the filing of an involuntary termination petition before the six month requirement has elapsed does not affect the subject matter jurisdiction of a court of common pleas but rather goes to the ability of such competent court to grant the requested involuntary termination.

## II.  Merits

Appellant's second argument is that the evidence does not support a finding that would permit involuntary termination under § 311(1), *supra*.  We do not agree.

"311.  Grounds for involuntary termination

"The rights of a parent in regard to a child may be terminated after a petition filed pursuant to section 312, and a hearing held pursuant to section 313, on the ground that:

"(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties . . . ."

The following elements are necessary for termination under (1) of § 311 of the Adoption Act:

1.  The parent, by conduct continuing for at least six months, has:

a.  "evidenced a settled purpose of relinquishing parental claim . . ., or

b.  "refused to or failed to perform parental duties."

This court stated in *Matter of Adoption of David C.*, 479 Pa. 1, 7–8, 387 A.2d 804 (1978):

". . . Because the section is written in the disjunctive, parental rights may be terminated if a parent *either* evidenced a settled purpose of relinquishing parental rights *or* the parent has refused or failed to perform parental duties. *In re Adoption of M. T. T.*, 467 Pa. 88, 354 A.2d 564 (1976).

". . . Although this Court, in interpreting section 311(1), has recognized 'that the measures taken by the parent to demonstrate his interest and affection must be viewed in light of the existing circumstances.' *Adoption of R. I.*, 468 Pa. 287, 297 n.10, 361 A.2d 294, 299 n.10 (1976); *In re Adoption of McCray*, 460 Pa. 210, 216, 331 A.2d 652, 655 (1975), certain parental responsibilities must be satisfied. As this Court stated in re: *Involuntary Termination of Parental Rights of S. C. B. and K. T.* [474 Pa. 615, 379 A.2d 535], supra:

" 'Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive and uninvolved interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. *In re Adoption of Orwick*, 464 Pa. 549, 347 A.2d 677 (1976); *In re Adoption of McCray*, 460 Pa. 210, 331 A.2d 652 (1975); *Appeal of Diane B.*, 456 Pa. 429, 321 A.2d 618 (1974); *In re Smith's Adoption*, 412 Pa. 501, 194 A.2d 919 (1963). This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. *In re Adoption of McCray*, supra; *Appeal of Diane B.*, supra; *In re Adoption of Jagodzinski*, 444 Pa. 511, 281 A.2d 868 (1971). Because a child needs more than a benefactor, parental duty requires that a parent "exert himself to take and maintain a place of importance in the child's life." *Appeal of Diane B.*, supra, 456 Pa. at 433,

321 A.2d at 620, quoting *In re: Adoption of J. R. F.*, 27 Somerset L.J. 298, 304–05 (Pa.C.P.1972).'" (Emphasis in original.)

Our scope of review of the facts in this case was delineated in the case of *In re Burns*, 474 Pa. 615, 624, 379 A.2d 535 (1977):

". . . Our inquiry is whether the orphans' court's determination that appellant refused or failed to perform parental duties for at least six months is supported by competent evidence. *Adoption of M. T. T.*, supra; *Adoption of Farabelli*, 460 Pa. 423, 333 A.2d 846 (1975); *Sheaffer Appeal*, 452 Pa. 165, 305 A.2d 36 (1973). The adjudication of the orphans' court will not be disturbed if 'the record is free from legal error and . . . if the chancellor's findings are supported by competent and adequate evidence, and are not predicated upon capricious disbelief of competent and credible evidence.' *Cohen Will*, 445 Pa. 549, 550, 284 A.2d 754, 755 (1971); *Holtz Will*, 422 Pa. 540, 544, 222 A.2d 885, 888 (1966); *Hunter Will*, 416 Pa. 127, 136, 205 A.2d 97, 103 (1964)."

Applying the above law to the facts of the instant case, we are of the opinion that the decree terminating appellant's parental rights must be sustained.

We will examine and review the record to determine whether Child Welfare produced competent evidence showing either a settled purpose to relinquish or the failure to perform parental duties during a six-month period from the date appellant became aware of his fatherhood to the date of the hearing.

The facts, as reviewed above, reveal that from March 17, 1977, the date appellant was first informed of the birth, until December 15, 1977, the date of the evidentiary hearing, appellant performed none of the "affirmative" parental obligations articulated in *Adoption of David C.*, supra.

Appellant in this case never attempted to see the baby, nor did he inquire as to the baby's health or well-being. Even after being informed of the baby's placement in a

foster home, appellant never expressed any interest in the child's welfare.

He was passive and uninterested in the development of his infant son. The record does show that appellant sought to have his mother care for the child, but when she decided that she could not accept the responsibility, he ceased pursuing the issue.

■ Appellant argues that because of his incarceration in the Lawrence County Jail, his lack of affirmative parental action should be excused. We do not agree.

In *Adoption of McCray*, 460 Pa. 210, 216–17, 331 A.2d 652, 655 (1975), this court, when confronted with a similar fact situation, stated:

> ". . . Initially, we note that performance was made more difficult for this appellant as he was in prison and unable to support his family for most of the period under consideration. However, a parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness 'in declining to yield to obstacles,' his other rights may be forfeited. See *In Re: Adoption of J R F*, 27 Somerset L.J. at 304."

Nothing in this record demonstrates that appellant utilized any of admittedly limited resources to take affirmative action to fulfill his parental duties.

Decree affirmed. Each party to pay own costs.

NIX, J., files a dissenting opinion in which MANDERINO, J., joins.

MANDERINO, J., files a dissenting opinion.

NIX, Justice, dissenting.

The majority has concluded that the decree terminating L. W.'s parental rights entered by the court below must be sustained. To reach this result, the court below and now the majority have fatally ignored flawed petition, have tortured prior precedent, and misstated the facts established in this record. Equally of grave concern to me is this Court's willingness to ignore, and thereby condone, the Lawrence County Child Welfare Services' (CWS) complete disregard of their obligation to appellant to assist him to establish and maintain a parental relationship with his natural child. I, therefore, must register a most vigorous dissent.

## I.

The petition to involuntarily terminate L. W.'s parental rights was filed on August 4, 1977. It is uncontroverted that L. W. first became aware of the natural mother's pregnancy and that he had fathered a child on March 17, 1977. Thus, the petition was filed less than five months after appellant became aware of the existence of his child. The petition asserted that termination was justified under § 311(1) of the Adoption Act.[1] Section 311(1) states the following grounds for the involuntary termination of parental rights:

§ 311. Grounds for involuntary termination

The rights of a parent in regard to a child may be terminated after a petition filed pursuant to section 312, and a hearing held pursuant to section 313, on the ground that:

(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties;

\* \* \* \* \* \*

1. Act of July 24, 1970, P.L. 620, No. 208, art. III, § 311, 1 P.S. § 311 (Supp.1978–79).

While our cases have held that 311(1) must be read in the disjunctive and termination of parental rights may be ordered if the evidence establishes either clause of the subsection, nevertheless *in either case the conduct must extend for a period of at least six months.* Since conduct chargeable against a parent under either section cannot begin until the parent is at least aware of the pregnancy and birth of the child, *Adoption of Ashton,* 374 Pa. 185, 197–98, 97 A.2d 368, 374–75 (1953); *Adoption of Sheaffer,* 58 Lanc.L.Rev. 15, 22 (1962), it is clear that the petition when filed did not set forth grounds under 311(1) which would have supported an order of termination in accordance with its prayer.[2]

The majority employs sophistry to reach the conclusion that the six month requirement is not a jurisdictional fact and thus glibly concludes that the court below had the right to consider the conduct up to the time of the hearing. Not only does such a conclusion pose serious procedural due process implications, it is not in accord with our prior case law. In *Commonwealth v. Ryan,* 459 Pa. 148, 327 A.2d 351 (1974), the court was presented on January 5th with a petition to enjoin a teachers' strike set for January 8th. An injunction was granted the day of the strike and the teachers' union appealed, contending that by anticipating the strike, the early filing of the petition improperly invoked the jurisdiction of the court, causing the injunctive complaint to be improperly before the court and invalidating the injunction. This Court agreed, and in an opinion by former Justice Pomeroy stated:

Having properly ruled that the School Board's application for injunctive relief was premature, the chancellor should have dismissed the complaint on January 5th. *The defect of premature filing could not be cured by the subsequent occurrence of the threatened strike.* As we

2. There is no basis on this record for holding appellant responsible for the belated awareness of the birth of his child where the natural parents were neither married nor living with each other, where the father was incarcerated and where the mother deliberately concealed from appellant the fact of the pregnancy and the birth. *Adoption of Sheaffer,* 58 Lanc.L.Rev. 15, 20, 22 (1962).

said in *Brenner v. Sukenik*, 410 Pa. 324, 328, 189 A.2d 246, 248 (1963): "[t]he question of equity's jurisdiction must be determined on the facts and circumstances existing upon the date the action is instituted: *Lafean v. American Caramel Co.*, 271 Pa. 276, 114 A. 622 (1921)." *See also Bulkin v. Sacks*, 31 Pa.D. & C. 501 (1937). . . . [The chancellor] assumed that the jurisdiction to enjoin found lacking on Friday the 5th would have ripened and become exercisable by Monday the 8th. *But it was not merely the power to grant an injunction that was absent on the 5th; it was the right of the School Board to invoke jurisdiction at all.* No right of action existed until the strike was in being. Where matters of jurisdiction are concerned, the courts must enforce the letter of the law. "No emergency, real or feared, and no alleged hardship to a complaining party, however great, can justify a court's entertaining and passing upon a subject matter which is not within its jurisdictional competence." *Pennsylvania Railroad Co. v. Pennsylvania Public Utility Commission*, 396 Pa. 34, 38, 152 A.2d 422, 424 (1959).

459 Pa. at 157, 327 A.2d at 355–56 (emphasis added).

Applying the majority's instant rationale to the facts of *Ryan*, we would have to conclude that since the court of common pleas has the authority to enjoin an unlawful strike, the existence of the unlawful strike is not a jurisdictional fact; thus when the strike did in fact occur, the court was empowered to act. The majority has thus sub silentio overruled our decision in *Ryan* and all of the other cases relied upon in *Ryan*. I accept the soundness of the decision in *Ryan* and reject the majority's attempt to undermine it.[3] This ground alone justifies a reversal of the decree entered below.

## II.

Even if we ignore the jurisdictional defect and reach the merits, I am satisfied that the record does not justify the

3. Interestingly, the author of the majority opinion joined the dissenters in *Ryan, Commonwealth v. Ryan*, 459 Pa. 148, 327 A.2d 351 (1974).

entering of an order terminating appellant's rights. To the contrary, appellant not only steadfastly maintained his desire to raise his child but also used every available resource at his disposal to accomplish that purpose. There was no showing of a "settled purpose" to relinquish his parental claim for any period of time. Moreover, appellant made every effort his circumstances would permit to establish a relationship with his child and to provide for its care and well-being.

Infant male M. was born on July 27, 1976, in New Castle, Lawrence County. On July 28, the infant was placed in the custody of CWS by B. M., his mother. Her parental rights were voluntarily terminated on September 10, 1976.

The uncontradicted testimony of the natural mother at the hearing to voluntarily terminate her parental rights reveals the following. She was thirteen years old, caucasian, and unmarried to the black father of M. when M. was born. During her pregnancy, she lived with her mother. At no time did she inform L. W. that she was pregnant.[4] After the child's birth, she refused to divulge the name of the father until the voluntary termination hearing, at which time she named appellant. Prior to and at the hearing, she was told by CWS that it would keep the baby for four or five years until she thought she was old enough to properly care for him, that the state would give her money to support the child if she kept it, and that she could have a free lawyer to represent her. It was stressed that the voluntary termination hearing would cease if she showed the slightest interest in keeping the child.

In February 1977, CWS located L. W. in the Lawrence County jail. On March 17, 1977, a CWS caseworker informed L. W. that he had fathered a child by B. M., and that the child was in the custody of foster parents selected by the CWS. L. W. expressed a desire to retain custody of his son and requested time in which to contact his (appellant's)

4. Nor did she inform her mother, with whom she was living, of her pregnancy. Her mother testified that she did not know or suspect her daughter was with child until the day of birth.

mother regarding raising the child for him. On March 24, appellant's mother told the caseworker that because of her job, she would be unable to care for the child. On March 29, appellant asked the caseworker to come to the jail at which time he told her that he was not going to voluntarily relinquish his parental rights. This was the last contact between the CWS and appellant.

On August 4, 1977, CWS filed a petition to involuntarily terminate L. W.'s parental rights. After a series of postponements, the hearing was conducted on December 15, 1977. L. W. was present at the hearing pursuant to a writ of *habeas corpus ad testificandum,* and was represented by counsel. L. W.'s uncontradicted testimony reveals that he had not known B. M. was pregnant or had given birth until he was so informed by the caseworker. He was steadfast in his desire to keep the child and raise him following his release from jail.[5] At one point after CWS had cut off contact with appellant, he contacted an attorney from Legal Aid, to ask if he could communicate with a caseworker about arranging visitation rights. He was instructed that these matters would be handled by counsel. The caseworker admitted at the hearing that she had refused to help L. W. meet with the natural mother. She further testified that she had told him that he could not contact the foster parents in whose care the child had been placed.

A review of the Court's prior decisions indicates that the CWS failed to meet its burden of proof under either clause of section 311(1). This Court recently discussed the "settled purpose" clause in *Adoption of Baby Girl Fleming,* 471 Pa. 73, 369 A.2d 1200 (1977). The Court stated at 76, 369 A.2d at 1202:

> The term "settled purpose" implies a finality of purpose. *Wolfe Adoption Case,* 454 Pa. 550, 312 A.2d 793 (1973). In our efforts to determine if such a purpose was present, this Court has required an "affirmative indication of a positive intent" to sever the parental relationship before

5. The record does not indicate when L. W. was to be released from incarceration.

we have upheld an involuntary termination. *In re Adoption of McAhren*, 460 Pa. 63, 70, 331 A.2d 419, 423 (1975); *Wolfe, supra.*

As the Court stated in *In Re Adoption of Farabelli*, 460 Pa. 423, 430–31, 333 A.2d 846, 850 (1975):

> We have stated, even inaction or lack of interest in a child for a period in excess of six months will not conclusively establish the required settled purpose of relinquishment. This section has been interpreted as requiring a deliberate decision on the part of the parent to terminate the parental relationship and that parent must persist in that determination throughout the six-month period. See *Wolfe Adoption Case*, 454 Pa. 550, 312 A.2d 793 (1973); *Sheaffer Appeal* [452 Pa. 165, 305 A.2d 36 (1973)].

From the foregoing summary of the undisputed testimony, it is clear that a finding of a "settled purpose" to relinquish would be totally unjustified. There was not one piece of evidence from which one could reasonably infer a deliberate decision by L. W. to abandon his child. To the contrary, the evidence shows conclusively his desire to establish and maintain a parental relationship with his son. Since the party seeking the order of termination has the burden of showing by a preponderance of the evidence that the statutory requirements have been met, *Adoption of Baby Girl Fleming, supra* ; *In Re Adoption of McCray*, 460 Pa. 210, 215, n.4, 331 A.2d 652, 654 n.4 (1975), it is eminently clear that the burden has not been met in establishing this ground of abandonment.

Regarding the second clause of § 311(1), the majority of this Court, presumably like the orphans' court below, found that even though L. W. was incarcerated he failed to utilize those resources at his command while in prison in continuing a close relationship with his child.[6] *See* at 305, quoting

---

6. Even putting aside the fact of L. W.'s incarceration, it is difficult to ascertain the nature of the communication required by the majority where the child was just eight months old when appellant discovered he was a father, and only 18 months old when the termination decree was entered. As Mr. Justice Manderino ably stated in one recent termination case:

*Adoption of McCray*, 460 Pa. 210, 216–17, 331 A.2d 652, 655 (1975). In reaching this conclusion, no attention was given to the fact that appellant's primary resource service was the CWS which, rather than help him retain his child, was instead actively working to undermine his parental relationship and terminate his parental rights.

CWS is required to operate under binding regulations promulgated by the state Department of Public Welfare. Act of June 13, 1967, P.L. 65, No. 21, art. 7, § 703, 62 P.S. § 703 (1968). These regulations clearly set forth a duty incumbent upon the agency to assist a natural parent in retaining his rights to his child. The applicable regulations imposed upon CWS the following obligatory responsibilities

> Rule 2–1–16. *The service provider shall insure*, either directly or through referral, *the availability of counseling and other services*, as needed, to natural parents, the child, and the adoptive parents.
>
> Rule 2–1–17. Children who shall be considered for adoption shall include:
>
> *    *    *    *    *    *
>
> —children whose parents, *even with the help of the community resources*, are unable or unwilling to give them the care and protection they need, and who can be freed for adoption through court action.
>
> Rule 2–1–19. Attention shall be given to the rights of the child's father whether he is married to the child's mother or not. Such rights include, but are not limited to:
>
> —notice of all proceedings or hearings;
> —counseling.
>
> Rule 2–1–28. The following services, if needed, shall be made available to natural parents either directly or by referral:
>
> —counseling;

Too bad the appellant was not born rich with the ability to sire a child prodigy capable of discussing current events at the age of four months—or at the very least eighteen months.
*Adoption of Baby Girl M.*, 481 Pa. 171, 392 A.2d 301, 304 (1978) (Manderino, J., dissenting).

—legal services;

—education services;

—health-related services;

—financial assistance;

—housing services.

Department of Public Welfare, Adoption Services, Rules and Regulations, 5 Pa.Bull. 2198, 2199 (1975) (emphasis added).

Most significant is the difference in the supportive assistance offered by CWS to the natural mother, in the event she had elected to keep the child, and its response to the natural father's enthusiastic expression of intention to raise his son. It would be understandable for an agency to discourage a parent who was incarcerated under a long term prison sentence, however, the record does not indicate that is the case here. *See* n.5, *supra*. To the contrary, his confinement to a county prison would suggest that the offense was a relatively minor one and that the sentence was not for a long period of time. The record indicated that L. W. attempted to secure placement of the child with this mother until his release. Such a temporary placement of the child would have been evidence of the proper exercise of his parental responsibilities.[7] *See, e. g., In re Adoption of P.,* 475 Pa. 197, 380 A.2d 311 (1977); *Wolfe Adoption Case,* 454 Pa. 550, 312 A.2d 793 (1973). It is well settled that a finding of failure to perform parental duties will not be permitted when it is based upon a temporary failure or inability which results from a parent's personal crisis. *In re Adoption of P., supra;  Matter of Kapcsos,* 468 Pa. 50, 360 A.2d 174 (1976); *Re: Adoption of M. T. T.,* 467 Pa. 88, 354 A.2d 564 (1976).

The court below was understandably concerned by the natural father's youth and immaturity. However, this did not justify the presumption, that if given the opportunity with the proper supportive aids he would fail or be incapable

7. In this context we note that other alternatives may have been available through various community resources, but that L. W. was not aided in this regard by CWS although their regulations required them to give such assistance.

of performing his parental responsibilities.[8] It must be borne in mind in all cases of this nature that involuntary termination of parental rights is a harsh and permanent measure which severs the closest blood relationship. It should never be permitted unless clearly warranted by the evidence. Here the record obviously does not warrant such a result.

I therefore dissent from today's opinion of the Court.

Justice MANDERINO joins this opinion.

MANDERINO, Justice, dissenting.

The majority says that it is alright for an agency to file a termination petition before the six month period is up and of necessity *misrepresent* the situation. Moreover, once the agency files the petition thereby creating an antagonistic event between itself and the natural father, the majority allows the agency to be considered blameless while the father is faulted for failure to manifest interest. The majority's reasoning is bootstrapping of the worst kind. The order terminating parental rights should be, without question, reversed. I also join in the dissenting opinion of Mr. Justice NIX.

8. In an analogous situation, the Superior Court refused to declare a newborn infant "deprived" and subject to removal from his parents' custody. In *Matter of DeSavage*, 241 Pa.Super. 174, 360 A.2d 237 (1976). The infant in that case had never been released into its parents' custody because it suffered a staph infection after birth and had to remain in the hospital. Three weeks after the infant's birth, the local child welfare service petitioned the court to have the infant declared "deprived" and removed from its parents' control. Because the infant had never been physically with its parents, the Superior Court found that the situation was too "conjectural" to allow a finding of deprivation, despite the immaturity of the parents, aged 15 and 19.

Before courts have permitted a welfare service to remove a child from the *custody* of its parents, they have ordered the service to instruct the parents in the skills needed to care for the child. In *Interest of Whittle*, —— Pa.Super. ——, 397 A.2d 1225, 1226 (1979), and to provide follow-up supervision where necessary, *id.*; *Matter of DeSavage, supra*. Here we are dealing with a much more drastic deprivation: completely and involuntarily terminating all of the parent's rights to his child.