**Flynn v. Bimber**

C.P. of Erie County, no. 15160-2003.

*Melissa H. Shirey,* for plaintiff.
*Joseph P. Martone,* for defendant.

CONNELLY, *J.,* January 7, 2005—

## PROCEDURAL HISTORY

The parties are the parents of triplets, born November 19, 2003, in Erie, Pennsylvania. Plaintiff filed for primary custody of the triplets on December 11, 2003, and defendant counter-filed for primary custody on December 16, 2003. Defendant filed for child support on February 2, 2004, and a support conference was held on May 4, 2004. A custody conciliation conference was held on May 6, 2004. Both parties appealed the support and custody determinations.

A combined support and custody de novo trial was held before this court on July 9 and July 29, 2004. Plaintiff is requesting that sole custody of the children be awarded to him. Defendant is seeking shared custody, but is also requesting reduced partial custody time with the plaintiff because of the children's tender age.

This court has previously determined that defendant has standing to pursue custody as legal mother of the triplets under the doctrine of in loco parentis, in an opinion and order dated April 2, 2004. That opinion and order (April 2 opinion) are incorporated in this decision as if set forth in full.[1]

Upon stipulation of the parties, the records of all prior proceedings, including the hearings on standing, shall

---

1. The April 2 opinion is also available at 66 D.&C.4th 1 (2004).

be incorporated with the records for these custody proceedings. The deposition of Amy Hokaj has also been submitted by stipulation of the parties. The court will enter a support order concurrent with its custody decision per agreement of the parties for the convenience of appellate review.

## FINDINGS OF FACT

Plaintiff, James Flynn, a resident of Kirtland, Ohio, is the biological father of the triplets. Defendant, Danielle Bimber, a resident of Corry, Pennsylvania, is a gestational surrogate who carried the triplet embryos formed by sperm donated by Flynn and eggs donated by Jennifer Rice, a resident of Texas.

Since their discharge from the hospital, the triplets have been primarily raised by defendant, a stay-at-home mother with three other children. At this time, the triplets appear to be happy, healthy, and growing normally despite their premature birth.

Defendant and her husband, Douglas Bimber, own a three-bedroom ranch home in Corry. At the time of trial, they were finishing an addition to the home in order to accommodate the triplets. Douglas Bimber is self-employed as a home appliance repairman and supports the family, making approximately $9,600 a year.

Since the children's birth, defendant has been responsible for most of the important decisions made in their lives, including healthcare. They are currently seen by Dr. Kurt Lund M.D., the same doctor who sees defendant's other three children. Dr. Lund is a general family practitioner with 35-40 percent of his practice in pediatrics. (Custody trial transcript, day 1, pp. 180-81.) He also

has experience dealing with multiple births, including quadruplets and several sets of twins in Corry. (Custody trial transcript, day 1, pp. 191-92.) Dr. Lund testified that the defendant was "a very dedicated mother" who followed through with the medical treatments he suggested. (Custody trial transcript, day 1, p. 181, line 22.)

Defendant testified that she has obtained medical insurance cards and other types of assistance to help care for the children. Plaintiff offered no financial assistance to defendant for the triplets' care from the time they were born until defendant filed for child support, almost three months later. Plaintiff also contributed no diapers, formula, or other necessities toward the triplets' care. As previously noted by the court, plaintiff's claim that he could not find the children despite mailing checks to defendant's home address is incredible. (April 2 opinion, p. 24.)

Plaintiff is employed as a math professor and department chair at Cleveland State University. He earns $106,000 a year as professor and $136,000 a year as both department chair and professor. Despite having sufficient financial resources to provide for the children, plaintiff did not voluntarily contribute to their financial support until a wage attachment was issued against him.

Defendant's financial history is not outstanding. It appears from her testimony that she may have been naïve and careless in her financial affairs. (Custody trial transcript, day 1, pp. 274-75, and day 2, pp. 32-35.) She incurred much debt in her first marriage, which carried over to her marriage to Douglas Bimber. Defendant filed for bankruptcy on July 2, 2003. There was some question whether defendant reported the money she received from the surrogacy contract to the bankruptcy court. (Cus-

tody trial transcript, day 2, p. 28.) As a result of the custody trial, defendant's bankruptcy case has been reopened for further investigation. (Custody trial transcript, day 2, pp. 29-32.) However, those proceedings are not under the purview of this court.

Before becoming a full-time stay-at-home mother, defendant held a few part-time, minimum wage jobs. Currently, defendant is responsible for the daily care of her three other children, Ryan, Brendan, and Julia, as well as the triplets. Defendant testified that they regard the triplets as siblings.

Throughout the custody trial, plaintiff alternated between complaining about the amount of money he has spent in legal costs and boasting about the affluent neighborhood and schools of his alleged home in Kirtland, Ohio.[2]

Plaintiff complained that he "spent a tremendous amount of money on this," that the triplets' hospital bill was "exorbitant," and that he took a job he did not want for an extra $30,000 to "pay for this thing." (Custody trial transcript, day 1, pp. 58-60.) Plaintiff further testified that no marriage date has been set by him and his fiancée due to legal expenses, and that they could not give up the death benefits pension received by his fiancée because "we really need the money." (Custody trial transcript, day 1, p. 14.)[3]

---

2. It remains unclear to the court where plaintiff truly resides. He testified that he lived with his paramour, Eileen Donich, in her home located in Kirtland, Ohio. However, plaintiff's tax returns and legal pleadings filed in Ohio list his address as an apartment in Copley, Ohio. (See plaintiff's brief, pp. 4-5 and brief exhibit B.)

3. Eileen Donich's husband died in December 1973, nearly 21 years ago. She has received and continues to receive a yearly death benefit.

Plaintiff boasted that Kirtland, Ohio, was an affluent suburb of Cleveland, close to good schools, hospitals, and cultural events such as theater and opera. He described defendant's home in Corry, Pennsylvania, as "economically depressed" and "poor," observations based on his few visits there.

Plaintiff was also very concerned with where the children should attend school, despite the fact that they are only a year old. While plaintiff testified that the Kirtland public school was superior to the Corry public school, he claimed that he could not "afford" to send the triplets to private school as an alternative means of education in Pennsylvania. (Custody trial transcript, day 1, pp. 109-10.) Defendant testified that she believes it is too early to decide where the triplets should attend school. However, two of her children attend Corry's public school and receive good grades. (Custody trial transcript, day 2, pp. 4-5.)

As chair of his academic department, plaintiff continues to work during the summer months in that capacity. Contrary to plaintiff's stated intentions at trial and previous hearings, he has not adjusted his work schedule to become actively involved in the lives of the children. During his 12-day vacation in July with the children, plaintiff testified that he did not take even one full day off. Rather, he testified that he "got home a little early" every day. (Custody trial transcript, day 1, pp. 65-75.)

Defendant testified that she repeatedly attempts to communicate with plaintiff regarding the welfare of the children, but plaintiff has refused to communicate more than the bare minimum. Plaintiff rarely speaks to her in person and even e-mail communication is limited to no more than a few sentences. (Custody trial transcript, day

1, pp. 225-26; day 2, pp. 17-18 and defendant's exhibit 11.) Due to the lack of information about the children from the plaintiff, defendant requested that a logbook accompany the children. (Custody trial transcript, day 1, p. 225.)

Further, plaintiff is often unavailable when defendant calls to speak with him about the children. (Custody trial transcript, day 1, p. 230.) His paramour often speaks for him, inserting herself into conversations with defendant and asking defendant to address concerns about the children only to her. It is clear from trial testimony that the paramour alone spends most of plaintiff's custody time with the triplets.

Eileen Donich is plaintiff's paramour or fiancée, but not his wife. For these proceedings, she has no legal standing. (April 2 opinion, pp. 15, 18.) Throughout defendant's pregnancy, it was Dr. Donich, not plaintiff, who communicated with defendant. This pattern has continued until the present.

During her testimony, Dr. Donich made frequent references to the triplets as "my babies." She indicated that she intends to make "superstars" of the triplets while in her care. (Custody trial transcript, day 1, p. 144.)

While plaintiff is at work, Dr. Donich testified that she takes care of the triplets and sometimes her four grandchildren as well. (Custody trial transcript, day 1, pp. 143, 151.) When plaintiff is home, they frequently take the children out to lunch or dinner "even if they don't eat." (Custody trial transcript, day 1, p. 150.) They also take them "to the store" and "to the track" to "socialize" them. (Custody trial transcript, day 1, pp. 149-51.)

Dr. Donich is the sole owner of the house in Kirtland, Ohio. While plaintiff contends that he resides with Dr. Donich in her home, trial testimony and exhibits revealed that plaintiff also rents an apartment. (Custody trial transcript, day 1, pp. 14, 31-33, plaintiff's brief, exhibit B.) The Kirtland house is 6,000 square feet with four bedrooms and bathrooms, a finished basement, and large front and back yards. (Plaintiff's exhibit A.) It is within walking distance of Dr. Donich's daughter's home, another large house where Dr. Donich often baby-sits her grandchildren. (Plaintiff's exhibit F.)

Dawn Donich, Eileen Donich's daughter, testified that she has no reservations about her mother's ability to care for her four children as well as the triplets. Dawn also observed plaintiff's interactions with the triplets and testified that they appeared to be normal and loving. (Custody trial transcript, day 1, pp. 123-24.) Dawn's children attend public school in Kirtland, which she is greatly pleased with.

Amy Hokaj, a licensed independent social worker in Ohio, testified by deposition as an expert witness on behalf of the plaintiff. Ms. Hokaj is also qualified as an "adoption assessor" in Ohio and is employed by Adoption Circle, a private agency. (Deposition of Amy Hokaj, pp. 9-10.) In that capacity, she conducts post-placement visits and home studies with potential adoptive parents.

Ms. Hokaj testified that she has done over a hundred home studies. She described the home study process as follows:

"A home study is a process that a family goes through who is going to either foster or adopt . . . . It involves collecting information, paperwork, from the families, as

well as interviewing all family members who reside in the home, gathering that data and then putting it together . . . ." (Deposition of Amy Hokaj, p. 12, lines 14-21.)

The purpose of a home study is "to approve a family for adoption or foster care." *Id.* at line 24. Families submit an application and fill out an information packet sent by the agency. (Deposition of Amy Hokaj, pp. 13-14.) The agency then conducts the home study.

Ms. Hokaj testified that her services were initially requested "for court purposes" by Eileen Donich. (Deposition of Amy Hokaj, p. 18, lines 8-14, and p. 37, lines 5-7.) She conducted two home studies, each approximately one and one-half hours long. (Deposition of Amy Hokaj, p. 46.) Both were arranged with the plaintiff and Dr. Donich ahead of time. The triplets were present for both visits.

The first home study was on January 17, 2004, with Dr. Donich and the second was May 22, 2004, with plaintiff. The second home study was done at the request of plaintiff's attorney. (Deposition of Amy Hokaj, pp. 17-18, lines 25, 1-7 and p. 79, lines 19-25.) Reports including family history, medical history, tax returns, criminal background checks, home fire and safety audits, and personal references were prepared by Ms. Hokaj after the home studies. (Deposition of Amy Hokaj, pp. 13-17.)

During the January visit, Ms. Hokaj noted that there were no cribs for the children. (Deposition of Amy Hokaj, p. 22.) She did observe other baby items such as bottles, diapers, spit-up or burp rags, and toys, mostly for older children. (Deposition of Amy Hokaj, pp. 48-49.) At that time, the triplets were approximately two months old.

At the May visit, there were cribs and other accessories for the children. Ms. Hokaj noted that the triplets'

development seemed "on target" and that they appeared to be "happy babies" with minor medical problems. (Deposition exhibit C.) The triplets were approximately six months old then.

Ms. Hokaj testified that plaintiff and Dr. Donich shared some information with her about the triplets' custody situation. (Deposition of Amy Hokaj, p. 35, lines 17-19.) She testified that she was aware that legal proceedings were pending in Pennsylvania. (Deposition of Amy Hokaj, p. 43.) However, she admitted that she was not made aware of the involvement of the defendant, Danielle Bimber, by either the plaintiff or Dr. Donich in January. (Deposition of Amy Hokaj, p. 39.) Dr. Donich referred to defendant only as "the surrogate." (Deposition of Amy Hokaj, p. 64, lines 20-24.) The plaintiff indicated that he was angry about the custody situation. (Deposition of Amy Hokaj, p. 80.) To date, Ms. Hokaj has never contacted defendant regarding the triplets.

Ms. Hokaj did not learn the legal names of the children until May. Even when pressed, the plaintiff and Dr. Donich refused to give her the legal names. (Deposition of Amy Hokaj, p. 42.) Ms. Hokaj was also unaware that Hamot Medical Center had called the Erie County (Pennsylvania) Office of Children and Youth about the plaintiff and Dr. Donich in late November 2003. (Deposition of Amy Hokaj, p. 73, lines 6-10.)[4] As a way of explanation, she testified, "I only know what they told me." (Deposition of Amy Hokaj, p. 45, line 14.)

_____

4. Ms. Hokaj was aware of a visit to Eileen's home by the Lake County (Ohio) Office of Children and Youth in May 2004, but she did not recall who told her about that visit.

Adoption Circle did not conduct any independent examinations or audits of the information provided by the plaintiff and Dr. Donich. Copies of the children's birth certificates were not obtained by the agency either.

Ms. Hokaj testified that she only checked the six references supplied by the plaintiff and Dr. Donich, most of whom were family members. Each reference was one page long with three questions. Most of the answers were no more than a few sentences long. Plaintiff and Dr. Donich both received references from Dr. Donich's children, Dawn and Dane, and their respective spouses, Jim and Lisa. Except for one, none of the references had known the plaintiff or Dr. Donich for more than eight years.

Ms. Hokaj found the Kirtland home to be adequate for raising the children. In her report, she wrote that there was "no contra-indication" for placing the children with plaintiff and Dr. Donich. (Deposition exhibit C.) An adoption consent and approval form, issued by Adoption Circle, was signed on July 6, 2004.

Under cross-examination, Ms. Hokaj admitted that the home studies she conducted did not compare the parenting abilities of the plaintiff and defendant. She also admitted that a home study is typically done before children are placed in the adoptive parents' home. (Deposition of Amy Hokaj, p. 37, lines 22-25.) Ms. Hokaj testified that it was her understanding that an adoption cannot take place until the rights of the legal parents are disposed of first. (Deposition of Amy Hokaj, p. 46, lines 1-8.) However, the triplets were already in Dr. Donich's home when Adoption Circle was called to do a home study. Further, the custody situation in Pennsylvania had not been resolved.

Several inconsistencies also arose between the testimony of the plaintiff and Dr. Donich and the information contained in Ms. Hokaj's report.

Dr. Donich stated that she was being treated for osteoporosis on the medical statement of foster care/adoptive applicant section of Ms. Hokaj's report. At trial, she denied that she had osteoporosis. (Custody trial transcript, day 1, p. 162, lines 9-13.)

Plaintiff told Ms. Hokaj that he was "an only child" but it was revealed that he has a sister 11 years younger than he. (Custody trial transcript at pp. 11 and 62-63, deposition of Amy Hokaj, pp. 80-81.) Plaintiff also claimed that he would use vacation time and/or reduce his teaching workload to spend time with the triplets. It was clear from his trial testimony that he has done neither. Plaintiff testified at trial and told Ms. Hokaj that he lived with Dr. Donich at the Kirtland home. However, both of his 2002 and 2003 tax returns listed his apartment address as his residence.

Both parties also disagree as to what names the triplets should have and be addressed by. Six days passed after the triplets' birth without contact from plaintiff before defendant decided to name them Matthew, Mark, and Micah Bimber. Those are the names listed on their birth certificates and are their legal names. Plaintiff and Dr. Donich chose the names Easton, Lance, and Shane Flynn. They refer to the children by these names only.

Plaintiff and those associated with him have refused to address the children by their legal names. Dr. Donich testified that she had not made up her mind whether to use the triplets' legal names or the names chosen by her and plaintiff. (Custody trial transcript, day 1, p. 161.)

Dawn Donich even admitted that, "we don't use those names." (Custody trial transcript, day 1, p. 134.)

At trial, plaintiff himself did not use any names, his or the ones chosen by defendant, when describing his interactions with the triplets. (Custody trial transcript, day 1, pp. 48-49.) He often referred to one child or another as "that one," "this one," "one of them," and at one point, "the biggest." (Custody trial transcript, day 1, pp. 48-49, 53; day 2, pp. 6-7.) Compared to the father, defendant/mother described each triplet by name and personality, as well as their eating and sleeping habits. (Custody trial transcript, day 1, pp. 23-25.)

## CONCLUSIONS OF LAW

### I. *Jurisdictional Issues*

Since legal action was brought in two states, Pennsylvania, where defendant and the triplets reside, and Ohio, where plaintiff resides, and the egg donor, Jennifer Rice, resides in Texas, the court must address the issue of jurisdiction before all other issues.

On April 22, 2004, Rice filed a verified complaint to establish parent/child relationship in Summit County, Ohio, against plaintiff, defendant, and defendant's husband, Douglas Bimber. Domestic Relations Court Judge John P. Quinn heard legal arguments on July 6, 2004, and issued a final order on October 29, 2004 (Ohio order).

Judge Quinn ruled that the Erie County Court of Common Pleas (this court) "has exclusive jurisdiction over the parenting determination with respect to the triplets." (Ohio order, p. 5.) He further held that the Summit County

Court "does not have jurisdiction to rule on the existence of a parent-child relationship between [defendant] and the triplets because this issue is subject to the continuing exclusive jurisdiction of the Pennsylvania court." (Ohio order, p. 6.)

Summary judgment was granted as to the existence of a parent-child relationship between Rice and plaintiff and the triplets. Defendant filed a petition for involuntary termination of parental rights (IVT petition) against Rice on August 26, 2004. Rice subsequently withdrew her preliminary objections to jurisdiction and her petition to dismiss the IVT hearing on November 19, 2004.

## (A) Priority

While the Ohio order clearly relinquishes jurisdiction to Pennsylvania, this court is bound by law to address jurisdictional challenges before turning to other matters such as support and custody. 23 Pa.C.S. §5347 (2004). See also, *Goodman v. Goodman,* 383 Pa. Super. 374, 556 A.2d 1379 (1989), where the trial court could refuse to acknowledge the custody order of a West German court because jurisdiction of custody matters is governed by the Uniform Child Custody Jurisdiction Act (UCCJA), the Commonwealth of Pennsylvania qualified as the "home state" under the UCCJA, and its custody proceedings were "first in time," under former 42 Pa.C.S. §5347 (now 23 Pa.C.S. §5347).

## (B) "First in Time"

Pennsylvania's "first in time" rule requires that a court refrain from exercising its jurisdiction over custody matters if another state's court already has jurisdiction. 23

Pa.C.S. §5347(a) (2004). If the court has reason to believe that there is another proceeding happening in a sister state, it must inquire about it and continue to communicate with the sister state's court. The proceeding will be stayed if the matter was pending in another state before Pennsylvania assumed jurisdiction or it is determined that Pennsylvania is the more appropriate forum.

In the present case, custody proceedings were initiated in Pennsylvania by plaintiff. Rice did not file her complaint in Ohio until 20 days after this court's April 2 opinion. In that decision, this court, in a footnote, observed that Rice had declined involvement in the standing and custody proceedings at that time.

Rice's pleading was not a complaint for custody, but rather a complaint to determine parentage of the triplets. An inquiry to Summit County by this court discovered Judge Quinn's order, which held Pennsylvania to be the more appropriate forum to determine the parent-child relationships between all three parties and the triplets.

Upon review of Pennsylvania and federal statutory law, it can also be concluded that this court does have jurisdiction over this matter in all its parts, including standing, custody, support, and the eventual IVT hearing.[5]

(C) Sufficient Contacts and Home State Jurisdiction

According to Black's Law Dictionary, sufficient connection jurisdiction in a child custody matter is deter-

---

5. The issue of defendant's legal standing has already been decided by this court. While plaintiff may have raised it again for purposes of making an appellate record, the matter for this court is res judicata. Jurisdiction over the custody and support issues flows from the standing decision.

mined when the best interest of the child/children is involved, at least one parent or litigant has connections to the state, and substantial evidence about child's present or future care, protection, training, and personal relationships is present. (8th ed., 2004, p. 870.) In general, the home state of the child or children is a state with sufficient connection jurisdiction. Black's also defines home state jurisdiction as jurisdiction based on the child having been a resident of the state for at least six consecutive months immediately before commencement of an intrastate child custody suit governed by the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). See *Scheafnocker v. Scheafnocker,* 356 Pa. Super. 118, 514 A.2d 172 (1986), where court found Pennsylvania had jurisdiction under the substantial contacts doctrine, despite the fact that the children (living in Texas) had not been residents for at least six consecutive months prior thereto so as to consider Pennsylvania the "home state."

The best interest of the children is most definitely involved here as it is the primary standard for child custody in this Commonwealth. Defendant, whom this court has recognized as the legal mother of the triplets, has connections to the state in that she has resided here most of her life. This is also the home state of the triplets, where they were born and where they have primarily resided for the first year of their lives. At issue in the custody, support, and IVT proceedings is the triplets' present and future care, where and by whom.

Rice and plaintiff are not residents of Pennsylvania, but their lack of contacts with this state is not the sole requirement for determining whether this court has jurisdiction over them. The statute does not require that *all*

parties have sufficient contacts with this state. Thus, this court finds enough contacts with Pennsylvania through defendant and the triplets to exercise jurisdiction.

## (D) Subject Matter Jurisdiction

Black's defines subject matter jurisdiction as "jurisdiction over the nature of the case and the type of relief sought to the extent which a court can rule on the conduct of the person or the status of things." (8th ed., 2004, p. 870.) See also, *Favacchia v. Favacchia,* 769 A.2d 531 (Pa. Super. 2001), where the court retained subject matter jurisdiction over a mother and her children after they moved to Delaware because they still had minimum contacts with Pennsylvania.

Here, the two pending cases do not involve the same legal issues (custody and support in Pennsylvania versus determining parentage in Ohio). While the issues and facts may intersect, they are not the same proceedings. See *Commonwealth ex rel. Graham v. Graham,* 367 Pa. 553, 80 A.2d 829 (1951), where an Ohio order awarding custody to a mother was not binding on Pennsylvania courts because the child's domicile was in Pennsylvania when the order was entered, therefore Ohio lacked both personal and subject matter jurisdiction. Further, the court finds this argument to be moot since Ohio has relinquished jurisdiction.

## (E) Inconvenient Forum

Although not specifically argued by either Rice or plaintiff, subject matter jurisdiction may also be challenged on the ground of inconvenient forum. Rice and plaintiff could reasonably argue that appearing before this

court in Pennsylvania would be inconvenient for her because she is a resident of Texas and he is a resident of Ohio. However, the primary focus of child custody jurisdiction is the location and welfare of the children. See *Commonwealth ex rel. Octaviano v. Dombrowski,* 290 Pa. Super. 322, 434 A.2d 774 (1981), where the trial court's order dismissing father's custody action on grounds of inconvenient forum was reversed because Pennsylvania was found to be the proper forum for the custody dispute since it was the child's home state pursuant to the UCCJEA; *Boudwin v. Boudwin,* 419 Pa. Super. 570, 615 A.2d 786 (1992), where the court held that Virginia was not an inconvenient forum for the mother because it was the home state of the children and no "live" custody proceeding was pending in Pennsylvania when she received the Virginia custody order from father; and *Levinson through Levinson v. Levinson,* 354 Pa. Super. 407, 512 A.2d 14 (1986), where determination of the convenience of a forum under the UCCJA is a possible step in an action and properly constitutes juridical business, thus, a motion to declare a forum inconvenient is a proceeding in custody within the meaning of the UCCJA. Pennsylvania trial court properly stayed its proceedings on a father's petition to stay an existing custody order issued by a Minnesota court, where the father was presently appealing the decision by the Minnesota court denying the father's motion to have the Minnesota court declare itself an inconvenient forum in the custody matter.

### (F) Intrastate Child Custody Jurisdiction

Rice also argued that this court should decline jurisdiction under the Uniform Child Custody Jurisdiction

Act, 23 Pa.C.S. §§5341-5366, the Uniform Child Custody Jurisdiction and Enforcement Act, 23 Pa.C.S. §5343, and the Parental Kidnapping Prevention Act (PKPA), 28 U.S.C.S. §1738A.

The requirements for child custody jurisdiction in Pennsylvania are set forth by 23 Pa.C.S. §5344. It reads in relevant part:

"(a) General Rule.—A court of this Commonwealth which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modificiation decree if:

"(1) this Commonwealth:

"(i) is the home state of the child at the time of commencement of the proceeding; or

"(ii) had been the home state of the child within six months before commencement of the proceeding and the child is absent from this Commonwealth because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this Commonwealth;

"(2) it is in the best interest of the child that a court of this Commonwealth assume jurisdiction because:

"(i) the child and his parents, or the child and at least one contestant, have a significant connection with this Commonwealth; and

"(ii) there is available in this Commonwealth substantial evidence concerning the present or future care, protection, training and personal relationships of the child." 23 Pa.C.S. §5544(a)1 and (a)2.

In this case, (a)1(i) and (ii) are applicable because the triplets were born here, continue to live here, and were present at least six months prior to the IVT petition. Sec-

tion (a)2(i) and (ii) is applicable as well because defendant has significant connections here and there is substantial evidence before this court to assess the best interests of the triplets.

The PKPA requires that full faith and credit be given to the child custody determinations of another state:

"The appropriate authorities of every state shall enforce according to its terms, and shall not modify except as provided in subsections (f), (g), and (h) of this section, any custody determination or visitation determination made consistently with the provisions of this section by a court of another state." 28 U.S.C.S. §1738A(a).

Sections (f) and (h) of the PKPA provide that a court may modify only if it has jurisdiction or if another state has declined jurisdiction. Section (g) provides that a court may not exercise jurisdiction if the matter is pending before another court. Again, the Ohio matter is no longer pending and that court has declined to exercise jurisdiction.

Under PKPA, this court has jurisdiction over the custody matter because there was "custody determination" (custody conciliation order) made in the triplets' home state (Pennsylvania) granting partial physical custody of a child to a "person acting as a parent" (defendant). 28 U.S.C.S. §1738A(b)3, 4, 6. See also, *Kriebel v. Kriebel,* 571 Pa. 356, 812 A.2d 579 (2002). PKPA provides that a child's home state is the state in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months, and this is consistent with the definition of the home state provided in 23 Pa.C.S. §5343 of the Pennsylvania Uniform Child Custody Jurisdiction Act.

### (G) Involuntary Termination of Parental Rights

Plaintiff argues that defendant has in part acknowledged Rice's interests by filing the IVT petition. According to 23 Pa.C.S. §2512(a)(3), defendant may file her petition because she is an "individual having custody or standing in loco parentis to the child[ren]." Since this court held her to be the legal mother of the triplets, she may also file under section 5212(a)(1) as a parent seeking to terminate another parent's rights. Defendant asserts three reasons in filing her petition, one being this court's decision on standing. The other two are grounds for termination of parental rights under 23 Pa.C.S. §2511:

"(a) General Rule—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

"(1) The *parent by conduct continuing for a period of at least six months immediately preceding the filing* of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or *has refused or failed to perform parental duties. . . .*

"(6) *In the case of a newborn child,* the parent knows or has reason to know of the child's birth, does not reside with the child, has not married the child's other parent, *has failed for a period of four months,* immediately preceding the filing of the petition *to make reasonable efforts to maintain substantial and continuing contact with the child and* has failed during the same four-month period to *provide substantial financial support for the child.*" 23 Pa.C.S. §2511(a)(1) and (a)(6). (emphasis added)

Given defendant's unique status as a gestational surrogate with legal parental rights trying to terminate the

rights of Rice, the genetically related egg donor, a brief review of the relevant case law is necessary.

The filing of an IVT petition prior to the legal expiration period does not affect the court's subject matter jurisdiction over the case. *In re Adoption of Infant Male M.,* 485 Pa. 77, 401 A.2d 301 (1979). Based on section 2511(a)(6), this is of little consequence since Rice's entry into this matter in Ohio did not occur until more than five months had passed since the triplets' birth.

If the petitioning party is not a legal parent, he/she must have standing in loco parentis instead. See *Silfies v. Webster,* 713 A.2d 639 (Pa. Super. 1998), where court gave prospective parents in loco parentis status to pursue custody of minor child they had cared for since birth, and *In re Adoption of W.C.K.,* 748 A.2d 223 (Pa. Super. 2000), where court found no standing or jurisdiction for IVT petitioners because they did not stand in loco parentis. Rice has not alleged in loco parentis status nor was she declared the legal mother. Defendant has been adjudged both.

Those defending against an IVT petition must show that they tried to create and/or maintain a relationship with the children. See *Appeal of L.S. and B.S.,* 745 A.2d 620, 623 (Pa. Super. 1999), where the court awarded custody of children to foster parents because it could not "in good conscience" turn the children over to a stranger, their father, who only saw them once in their entire lives, and *In re B.,N.M.,* 856 A.2d 847 (Pa. Super. 2004), where the court involuntarily terminated father's parental rights due to his failure to assert them from jail, allowing two years to pass without any attempts to contact child or mother, and discontinuing cards and gifts he sent early in the child's life.

To date, the court has seen no evidence that Rice contacted or attempted to contact anyone for information about the triplets.[6] She has sent no cards, letters, gifts, etc. to the triplets or their caretakers.[7] Further, there is no evidence that she has even left the state of Texas to travel to either Ohio or Pennsylvania to exercise her alleged rights. She has, to date, offered no explanations for her absence from their lives.

### (H) Indispensable Party

In his custody brief, plaintiff argues that this court lacked jurisdiction to decide standing because it did not join Rice as an "indispensable party" or hear testimony from her regarding her parental interests. (Plaintiff's brief, pp. 17-19.) According to *Barren v. Dubas,* 295 Pa. Super. 443, 441 A.2d 1315 (1982):

"Failure to join an indispensable party 'goes absolutely to the court's jurisdiction and the issue should be raised sua sponte.'... 'In Pennsylvania, an indispensable party is one whose rights are so directly connected with and affected by litigation that he must be a party of record to

---

6. The possible list of contacts includes James Flynn, the biological father; Eileen Donich, plaintiff's paramour; Danielle Bimber, the legal mother; Douglas Bimber, Danielle's husband; Hamot Medical Center, the hospital where the triplets were born; the *Erie Times-News* and other news organizations that have covered this case; or even this court.

7. But, Rice somehow learned about the custody dispute in Pennsylvania and chose to file legal papers in Ohio. The court is concerned about the possible conflicts of interest and the appearance of collusion between Rice and plaintiff against defendant. Upon review of copies of the Ohio pleadings submitted as exhibits B and C to plaintiff's brief, it seems that plaintiff and Rice were represented by the same Ohio law firm.

protect such rights, and his absence renders any order or decree of court null and void for want of jurisdiction.' . . . ('A person is a necessary and indispensable party only when his rights are so connected with the claims of the litigants that no decree can be made without impairing his rights.')." 295 Pa. Super. at 444, 441 A.2d at 1316. (citations omitted)

This court acknowledged Rice in a footnote in the April 2 opinion with the understanding that she was originally an anonymous egg donor who signed her rights away by contract, much like anonymous sperm donors. From the court's research, there appears to be no corresponding case law for egg donors as there is for sperm donors. See *Ferguson v. McKiernan,* 855 A.2d 121 (Pa. Super. 2004), and *Kesler v. Weniger,* 744 A.2d 794 (Pa. Super. 2000), where informal agreements between mother and father not to seek child support are void because the right of support is the child's, not the parents.

At the time of the April 2 opinion, the court decided to treat Rice as any other anonymous biological donor. (April 2 opinion, p. 2 n.4.) The problem now is that Rice is no longer anonymous and the surrogacy contract she signed has been declared void. However, Rice and the sperm donor fathers in *Ferguson* and *Kesler* are exceptions to the norm.

Rice did not make any claims until after this court issued its standing decision in April, almost five months after the triplets were born. She did not file anything regarding her rights to the children in Pennsylvania, such as a motion to reconsider, a petition to intervene, or similar protest until defendant filed her IVT petition in August. Ordinarily, the court believes a hearing would give Rice an opportunity to be heard on her alleged parental

rights. However, Rice chose to withdraw her jurisdictional objections as well as the petition to dismiss the IVT petition, thus there is some question whether she will appear at the IVT hearing.

Until then, the custody of the children needs to be decided in a timely fashion. Thus far, there have been only two interested parties—the plaintiff, James Flynn, and the defendant, Danielle Bimber. If Rice truly wants to become involved, the court can amend its custody order and join her as a party at a later date.

## (I) Standing

Plaintiff's argument against standing this time is that the court should not have raised the surrogacy contract and public policy issues sua sponte without giving counsel the chance to brief and argue them first. (Plaintiff's brief, pp. 20-21.)

Plaintiff also argues that no contractual relief was requested by either party. The court would point out that the surrogacy contract was presented as supporting evidence *by plaintiff* that defendant lacked standing. (Plaintiff's brief, p. 20.) (emphasis added) His contention that the validity of the contract was not necessary to determine the issue of standing does not follow when he was the one who presented it to the court. By law, all evidence must be relevant or it is inadmissible. Pa.R.E. 402 (2004). The court determined at the first standing hearing that the surrogacy contract was admissible. Plaintiff cannot take it back now because he does not agree with the court's determination.

The court believes it was well within its authority to address the surrogacy contract and any legal issues re-

lated to it. A contract pertaining to the custody of a minor child is always subject to being set aside in the best interest of the child. *Walker v. Walker,* 308 Pa. Super. 280, 283, 454 A.2d 130, 132 (1982). See also, *Grom v. Burgoon,* 448 Pa. Super. 616, 672 A.2d 823 (1996), which held that a court may raise standing and related issues sua sponte if there is a cause of action.

In the case at bar, the cause of action is a determination of legal custody of the triplets. Deciding custody requires a determination of who the legal parents are. The surrogacy contract between the parties did not provide for a legal mother. This court found the contract to be void as against state public policy because it did not provide for a mother and also allowed the parties to sign away the children's rights (which is not in their best interests). Thus, the court found defendant to be the children's legal mother and that she acted and continues to act in loco parentis to the triplets.

By law, legal parents have automatic standing for custody, as do those who stand in loco parentis. See also, *Vicki N. v. Josephine N.,* 437 Pa. Super. 166, 649 A.2d 709 (1994), where child's aunt stood in loco parentis, and natural mother showed no desire to parent until several years later, and the court ruled that her objection to aunt's standing was raised too late. With plaintiff's primary evidence (the contract) being ruled void, the court turned to defendant's in loco parentis argument and found it to be credible in addition to deciding that she was the legal mother. (April 2 opinion, pp. 19-23.)

Further, plaintiff's contention that the contract requires that it shall be governed by and enforced only by the state of Ohio is not persuasive. Plaintiff filed his initial pleadings here in Pennsylvania and continues to avail

himself of the Pennsylvania courts. Hearings on standing, custody, and support have all been held here. Only after this court issued its ruling on standing, did plaintiff, and later Rice, file pleadings in Ohio. Until then, there was no "live" custody proceeding in Ohio. See *Boudwin v. Boudwin,* 419 Pa. Super. 570, 615 A.2d 785 (1992). Since the Ohio court has relinquished jurisdiction to Pennsylvania, there will be no "live" custody proceedings in Ohio.

The court finds that plaintiff has more than submitted to the jurisdiction of Pennsylvania, by appearing in person, or by counsel, at hearings held here and by bringing the issue of custody here, seeking relief from the Pennsylvania courts. In addition, since defendant and the triplets are Pennsylvania residents, the court has jurisdiction over them because Pennsylvania has been their home state for more than six months.

## II. *Custody Issues*

"In any custody determination, the paramount consideration is the best interest of the child." *Jackson v. Beck,* 858 A.2d 1250, 1252 (Pa. Super. 2004), citing *Myers v. DiDomenico,* 441 Pa. Super. 341, 657 A.2d 956 (1995), and *Moore v. Moore,* 535 Pa. 18, 634 A.2d 163 (1993). "The 'best interests' standard, employed on a case-by-case basis, compels consideration of all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being." Jackson, *supra* at 1253, quoting *Sawko v. Sawko,* 425 Pa. Super. 450, 625 A.2d 692 (1993). The good qualities of both parents in a custody dispute must be taken into account as well. *Rowles v. Rowles,* 542 Pa. 443, 447, 668 A.2d

126, 128 (1995). In determining the best interests of the triplets, the court has considered numerous factors and case law below.

(A) Biological Father vs. Third-Party Surrogate

Plaintiff again raises the argument that the defendant is a third party seeking custody of the triplets in defiance of his wishes as a biological parent. He relies on *Seder v. Seder,* 841 A.2d 1074 (Pa. Super. 2004). However, that reliance is misplaced because the mother defied a court order prohibiting her from taking the children to another country. While the father in *Seder* obviously disagreed with the mother's actions, he was ultimately not the one she wrongly defied. Here, the defendant is not in violation of any court order.

In fact, this court has previously determined that she has in loco parentis status and can pursue custody. See *S.A. v. C.G.R.,* 856 A.2d 1248 (Pa. Super. 2004) (Trial court properly denied the father's preliminary objections because the mother had standing to pursue her custody action by virtue of her in loco parentis status to the child where the mother had lived with and parented the child since birth.).

Biological parenthood is not the only source of custody rights. *McDonel v. Sohn,* 762 A.2d 1101 (Pa. Super. 2000). Nor does a third party seeking custody have to prove that the biological parent is unfit. *Charles v. Stehlik,* 560 Pa. 334, 744 A.2d 1255 (2000). In *Charles,* custody of the minor child was awarded to the stepfather over the biological father based on the evidence and testimony of several witnesses. See also, *Short v. Finogle,* 36 D.&C.4th 115 (1997), where the court gave former guard-

ians liberal visitation with the 3-year-old child over biological mother's objections because the child had grown to love them and had resided with guardians since the age of one.

The *Charles* court also relied on the Pennsylvania Supreme Court's decision in *Albright v. Commonwealth ex rel. Fetters* in determining the parties' right to custody:

"In *Albright v. Commonwealth ex rel. Fetters,* 491 Pa. 320, 421 A.2d 157, 161 (1980), we stressed that the biological parent's prima facie right to custody 'is not to be construed as precluding a custody award to a non-parent, absent a demonstration of the parent's dereliction. . . . [O]ther factors which have significant impact on the well being of the child can justify a finding in favor of the non-parent, even though the parent has not been shown to have been unfit . . . .' While this Commonwealth places great importance on biological ties, it does not do so to the extent that the biological parent's right to custody will trump the best interests of the child. In all custody matters, our primary concern is, and must continue to be, the well-being of the most fragile human participant—that of the minor child." *Charles* at 342, 744 A.2d at 1259. (citations omitted)

Although plaintiff objects to defendant having any custody time with the children, his protests must come second to the overall rights of the children. What plaintiff wants does not trump what his children deserve, a caretaker acting in their best interests. As the courts have held, a biological connection to the children is not an absolute or even preferential requirement. Therefore, defendant should be considered as a potential custodial parent, whether plaintiff approves or not.

## (B) Children's Tender Years and Stability

While Pennsylvania no longer follows the "tender years" doctrine, a court may consider the children's age(s) and which parent is their primary caretaker. The role of the primary caretaker is a substantial factor which the trial judge must weigh in adjudicating a custody matter where the child is of tender years. *R.A.R. v. T.M.,* 434 Pa. Super. 592, 596, 644 A.2d 767, 769 (1994). As the court in *Commonwealth ex rel. Jordan v. Jordan,* 302 Pa. Super. 421, 448 A.2d 1113 (1982), held:

"[W]here two natural parents are both fit, and the child is of tender years, the trial court must give positive consideration to the parent who has been the primary caretaker. Not to do so ignores the benefits likely to flow to the child from maintaining day to day contact with the parent on whom the child has depended for satisfying his basic physical and psychological needs." 302 Pa. Super. at 425, 448 A.2d at 1115. (footnotes omitted)

Based on all of the testimony presented, defendant is the better caretaker by far, and primary custody should remain with her. Defendant was able to comprehensively describe the children's daily routines, their individual personalities, the medical care they received, and more. Unlike plaintiff, she used actual names and terms of affection for each child.

Moreover, defendant has assumed all parental responsibilities, though she initially did not intend to, from the time the triplets were only days old and still in the hospital. She has made certain that the children have received their vaccinations on time and that one triplet (Micah/ Shane) with neck problems received physical therapy. Defendant has followed through with all recommended

medical treatments and the children have flourished in her care, as Dr. Lund testified. To remove them now would disrupt their stable and beneficial daily routines with her. See *Gerber v. Gerber,* 337 Pa. Super. 580, 586, 487 A.2d 413, 417 (1985) (Mother's care of minor child since birth was better for child's stability, thus, primary custody remained with her.); and *Bresnock v. Bresnock,* 346 Pa. Super. 563, 500 A.2d 91 (1985) (Primary custody of child returned to mother once her life stabilized, rather than grandparents who tried to turn child against her.); and *Wiseman v. Wall,* 718 A.2d 844, 849-50 (Pa. Super. 1998) (Court rejected alternating week custody schedule for 15-month-old child as too disruptive and destabilizing to child who was too young to voice his discomfort with it.).

Defendant also spends the majority of her time at home with the triplets and her other children. Plaintiff and his paramour testified that they take the children out to many places, mostly to show them off in public. While the court does not condemn occasional outings, it does recognize the children's need for a stable home environment surrounded by loving family, not curious strangers.

It is the policy of this Commonwealth to raise siblings together, if possible. *Hockenberry v. Thompson,* 428 Pa. Super. 403, 632 A.2d 204 (1993). Siblings should be separated only when there are "compelling" reasons to do so. *Pilon v. Pilon,* 342 Pa. Super. 52, 492 A.2d 59 (1985). This applies to stepsiblings too. *Ferdinand v. Ferdinand,* 763 A.2d 820 (Pa. Super. 2000). While defendant's children, Ryan, Brendan, and Julia, are not technically siblings to the triplets, they are part of the family environment the triplets are growing up in. Testimony showed that the Bimber children already regard the triplets as

their three little brothers. To separate the children now merely because they are not genetically related to each other would do more harm than good to their family environment. There is no compelling reason for this court to do such harm.

Further, given testimony that plaintiff and Dr. Donich openly argued with defendant over the triplets in the presence of the Bimber children, the court finds that behavior not to be in the best interests of the triplets. As they grow and develop a relationship with the Bimber children as quasi-siblings, any negative actions by plaintiff and Dr. Donich toward the Bimbers will undoubtedly have a detrimental effect on the children. It is strongly recommended by the court that all parties involved conduct themselves as civilly as possible while in the presence of *any* of the children.

## (C) Standards of Living

Plaintiff and his paramour repeatedly emphasized their higher income, larger house, and better-rated schools over what defendant can provide, and has already provided, for the children. As *Kessler v. Gregory,* 271 Pa. Super. 121, 412 A.2d 605 (1979), held:

"Among the factors to be considered in determining the best interests of the child are the character and fitness of the parties seeking custody, their respective homes, their ability to adequately care for the child, and their ability to financially provide for the child. *Shoemaker Appeal,* 396 Pa. 378, 381, 152 A.2d 666, 668 (1959). However, ' "[u]nless the income of one party is so inadequate as to preclude raising the [child] in a decent manner, the matter of relative incomes is irrelevant." '

*Custody of Myers,* 242 Pa. Super. 225, 230, 363 A.2d 1242, 1244 (1976) (quoting *Commonwealth ex rel. Grillo v. Shuster,* 226 Pa. Super. 229, 239, 312 A.2d 58, 64 (1973))." 271 Pa. Super. at 124-25, 412 A.2d at 606-607.

While a court may take into account the economic status of a party, it cannot ignore all other aspects of a child's well being and best interests. *McAnallen v. McAnallen,* 300 Pa. Super. 406, 411, 446 A.2d 918, 921 (1982) (Trial court failed to consider best interests of the child when it granted custody to the higher wage earner despite the fact child thrived in lower wage earner's care.). A court is not obligated to award custody of a child to one party over another based solely on a bigger house or a better standard of living either. *Roadcap v. Roadcap,* 778 A.2d 687, 690 (Pa. Super. 2001). In *Roadcap,* the Superior Court agreed with the trial court's finding that the parties were "both fit, but imperfect" to parent. But, the court found fault with the trial court's decision "largely based on the parties' financial inequality" despite its finding that the mother was the better, more available parent for the children. The Superior Court awarded custody to the mother.

This court does not dispute that plaintiff and his paramour have more than enough financial resources and space in their home to provide for the children. But, as *McAnallen* held, the court cannot ignore other factors affecting their welfare. Defendant is better able, at this time, to provide daily, hands-on care for the children. Plaintiff has shown that he is not. He has not altered his work schedule to make himself available to care for the children. It is difficult for the court to comprehend why plaintiff, as the person in charge of his academic department, cannot take even one day off to spend time with

his children. Plaintiff testified that he received several personal and sick days per year. The court would presume that taking time off during the summer months would be even easier since most universities have fewer students and classes at that time.

Further, defendant's financial past, including her bankruptcy case, is irrelevant to her performance as primary caretaker of the children. In spite of her financial troubles, defendant has demonstrated that she is able to provide for the children in every way. It seems hypocritical for plaintiff to ask this court to scrutinize defendant's past and hold it against her while at the same time ask the court to disregard the six days when plaintiff did not visit the children in the hospital.

Plaintiff, his paramour, and her family seem more concerned with their relative wealth and upscale community than the welfare of the children. Right now, the triplets are not old enough to appreciate how big their house is or how much money their parents make or where they will go to school. They are only aware of who cares for them, feeds them, bathes them, clothes them, changes their diapers, etc. The party that is better able to provide that kind of care should be the primary custodian of the children. That party here is the defendant.

### (D) Houses

Plaintiff's paramour, Eileen Donich, is the sole owner of the house in Kirtland, Ohio. While plaintiff contends that he resides with Dr. Donich in her home, he also rents his own apartment. Defendant and her husband own a modest ranch home, to which they are putting on an addition. As stated previously in *Kessler,* the parties' re-

spective homes may be one factor in consideration of the best interests of the children.

The court is not completely convinced of the permanence of plaintiff and his paramour's living arrangement. While both testified that they've been living together for several years, they have not purchased or rented a home together. If their relationship should, however unlikely, fail, Dr. Donich will remain the sole owner of the Kirtland house. Plaintiff will have no claim to the sizeable home he touts as part of the children's best interests.[8]

### (E) Education

Plaintiff seems very concerned about the triplets' schooling long before they are even preschool age. See *Jackson v. Beck*, 858 A.2d 1250 (Pa. Super. 2004) (Father's request to modify custody arrangement for child's education was denied because child was not old enough to be enrolled in school yet.).

Over and over again, plaintiff and the witnesses on his behalf touted the benefits of the Kirtland schools. Plaintiff refused to consider the possibility that the triplets might attend school in Corry. Further, he denied be-

---

8. The court points to another case of first impression, decided after the April 2 opinion, from Tennessee, as a cautionary tale for plaintiff and his paramour. *In re C.K.G., C.A.G., C.L.G.,* 2004 Tenn. App. Lexis 394 (2004), where an unmarried couple (who held themselves out as married on the fertility clinic contracts) broke up after "wife" was implanted with donated eggs and gave birth to triplets. "Husband" withheld financial support and tried to argue that the triplets had no mother because the egg donor gave up her rights and "wife" had no genetic tie to them. The Tennessee court found "husband's" argument to be erroneous and awarded primary custody to "wife" based on the children's tender age. The couple's ownership of a house as tenants in common was evidence of their intent to parent the children together.

ing able to pay for private school in Pennsylvania, even though it might provide just as good an education as the Kirtland schools.

If plaintiff is truly so concerned with the children's education this early, then he should start saving or planning for it now. With all the financial resources plaintiff claims to have in Kirtland, investing in his children's future education should not be too burdensome.

While it remains too early to decide the children's education, the court would strongly suggest that both parties keep an open dialogue about the subject. Neither party should attempt to enroll the children in any educational program at any age without first consulting with the other. When the time for school comes, they will hopefully be able to make a sound, informed decision together for their children.

### (F) Involvement of Eileen Donich

Testimony from those who have frequent contacts with the children, including paramours, must be heard for a court to determine what is in the children's best interests. *Haller v. Haller,* 377 Pa. Super. 330, 547 A.2d 393 (1988). A court should also take into account whether such contact would interfere with the parent/child relationship. *Douglas v. Wright,* 801 A.2d 586 (Pa. Super. 2002). See also, *Fausey v. Hiller,* 851 A.2d 193 (Pa. Super. 2004) (Burden is on grandparents with partial custody of grandchild to show they will not interfere with parent-child relationship.).

If a party/parent allows others to perform parental duties during the majority of his/her designated partial custody time, the court may consider that as well. See

*Roadcap, supra* at 690 where court expressed some concern over father's delegation of some of his parental duties to his mother, and *Wiseman, supra* at 850, where child spent more of his waking hours in daycare than with father during father's partial custody time.

Plaintiff has consciously chosen not to play an active role in the care and decision-making for his children. Instead, he has deferred the majority of his responsibilities to his paramour, Eileen Donich. Indeed, it is she, not plaintiff, who spends the majority of the partial custody time with the triplets.

The court has grave concerns over the participation of Eileen Donich in the lives of the children. Her testimony, in addition to being inconsistent on several occasions, indicates that she is far too involved in the children's lives, to the point of attempting to exclude both father and mother from their parental duties. Her repeated references to "my babies" reveal an unusual amount of possessiveness toward the children.

In her testimony, both at trial and at the standing hearings, Dr. Donich showed an overly intense desire to keep the triplets in the care of her and the plaintiff. It seems that she will do or say just about anything to appear sympathetic. While an attempt to impress the court is normal in a custody trial, Dr. Donich far exceeded presenting herself in the best possible light. She also attempted to portray the defendant in the worst possible light. For example, her story at trial about seeing cats in the triplets' cribs and scratches on their faces was found to be unbelievable when the defendant testified that the cats were de-clawed and the cribs were in plain sight in the living room.

Dr. Donich's tendency to exaggerate, overreact, and undercut the actions of others, including the parents, clearly demonstrates to this court that she might not act appropriately regarding the best interests of the children. She has not shown how her conduct does not interfere with the parent-child relationship between plaintiff, defendant, and the triplets.

It is also very apparent from their testimony that plaintiff, and Dr. Donich especially, like showing off the children, almost as if they were objects. The court cannot emphasize enough that this is not in the children's best interests. They are human beings to be cared for, not shown off like shiny new toys.

## (G) Expert Testimony of Amy Hokaj

Amy Hokaj, a licensed independent social worker and "adoption assessor" in Ohio, testified by deposition as an expert witness on behalf of the plaintiff. Her testimony shall be considered only in conjunction with all the other evidence presented before the court. *Watters v. Watters,* 757 A.2d 966, 968-69 (Pa. Super. 2000), citing *Smith v. Shaffer,* 511 Pa. 421, 426, 515 A.2d 527, 529 (1986). Uncontradicted expert testimony may be accepted or denied by the court as long as the court's conclusions are founded in the record. *Nomland v. Nomland,* 813 A.2d 850 (Pa. Super. 2002). As the court in *Jackson v. Beck,* 858 A.2d 1250 (Pa. Super. 2004), held:

"[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives on [sic] the parties concerned . . . . Accordingly, *the fact-finder is free to believe*

*all, part, or none of the evidence . . . ."* at 1254, citing *B.S. v. T.M.,* 782 A.2d 1031 (Pa. Super. 2001). (emphasis added)

The deposition testimony of Amy Hokaj did little to alleviate this court's concerns about plaintiff and his paramour. While Ms. Hokaj was presented as an expert witness, the court found her expertise in adoption placement to be severely lacking in this case.

Defendant argues that the court should afford only "minimal weight" to Ms. Hokaj's home study conclusions. The court is inclined to agree, especially in light of the inconsistent answers given to Ms. Hokaj by plaintiff and Dr. Donich and their testimony presented to this court.

Further, upon a brief review of Ohio adoption law, it appears to the court that the plaintiff and Dr. Donich did not even attempt to comply therewith. Adoptions in Ohio are governed by statute under Ohio Revised Code 3107. 01-3107.99 (2001). Only an agency or an attorney may arrange an adoption. O.R.C. 3107.011.[9] An adoption pe-

---

9. See *Decker (Lowd) v. Decker,* 2001 Ohio 2279, 2001 Ohio App. Lexis 4389, where the Ohio court of appeals decided that a sister/ surrogate (Lowd) was the legal parent of child and awarded primary custody to her over the objections of her brother (Decker) and his boyfriend (Pope), who also fraudulently claimed paternity instead of anonymous sperm donor. The court was deeply concerned that all parties failed to go through proper Ohio adoption procedures.

"Appellees [Decker and Pope] . . . rely on the merits of an agreement made prior to [the child's] birth. Specifically, appellees insist that Lowd agreed to 'have a baby for Decker.' Again, while that may be true, 'one cannot claim the status of an adoptive parent merely through an oral agreement [with a surrogate mother].' *Seymour v. Stotski,* 82 Ohio App. 3d 87; 611 N.E.2d 454 (1992) . . . . It has long been recognized that, as a matter of public policy, the state will not

tition may be filed in the county of residence of either the minor child or the adoptive parent. O.R.C. 3107.04. Such a petition may be stayed or dismissed if another forum has jurisdiction. *Id.* Timely petitions should be filed within 90 days after a child is placed in the home. O.R.C. 3107.051. Both mother and father must consent to the adoption before it is granted. O.R.C. 3107.06. An unmarried potential adoptive parent, such as Dr. Donich, is eligible to adopt a child. However, the right to adopt a child is still governed by the best interest of the child. See *In re Adoption of Charles B.,* 552 N.E.2d 884 (Ohio 1992).

Plaintiff and Dr. Donich hired Adoption Circle to arrange adoption of the triplets in their county of residence. However, the adoption petition, if one exists, must be stayed because Pennsylvania, not Ohio, has jurisdiction. The consent of the legal mother of the triplets has clearly not been given. There is no evidence that the egg donor consented to the adoption either. Plaintiff and Dr. Donich pursued adoption without following the required legal procedures in Ohio to do so. Certainly Adoption Circle, as an adoption agency licensed in Ohio, should have recognized that.

The court is greatly troubled by Adoption Circle and Ms. Hokaj's failure to follow up when questions about the plaintiff and Dr. Donich arose. In the course of a more thorough investigation, she should have discovered the identity of the defendant, the actual legal names of the triplets, the legal pleadings filed by the egg donor in Ohio and by the defendant in Pennsylvania asking to be de-

---

enforce or encourage private agreements or contracts to give up parental rights. *Belsito v. Clark,* 67 Ohio Misc.2d 54, 644 N.E.2d 760 (1994)."

clared legal mother, and the two separate calls to child welfare agencies in Ohio and Pennsylvania.

Merely relying on the information supplied by the plaintiff and Dr. Donich is not enough to safely place three young children in their care. While this court has had the benefit of seeing and hearing more information than Ms. Hokaj, what she lacked could have been easily remedied with a few pertinent questions and deeper investigation.

The court further notes the adoption consent and approval form was signed by Adoption Circle, not the State of Ohio or a court of law. It is merely a recommendation and has no legal weight. The form was also completed only three days before the custody trial. Again, the court wonders why the plaintiff and Dr. Donich waited so long if they truly intended to be parents to the triplets.

## (H) The Children's Names

This is not a typical name change case. Defendant named the triplets six days after they were born. Those names are on the birth certificate, and plaintiff has not specifically petitioned to change them. But, by his actions, and those around him, the children have two sets of names: Matthew, Mark, and Micah Bimber and Easton, Lance, and Shane Flynn. Therefore, it is for the court to decide which names are in the best interests of the children. Under 54 Pa.C.S. §702, a court of common pleas may order the change of the name of any person who resides in the county.

The best interest of the child is the overall standard for name changes. *In re Change of Name of Zachary Thomas Andrew Grimes to Zachary Thomas Andrew*

*Grimes-Palaia,* 530 Pa. 388, 609 A.2d 158 (1992). A court may also consider the natural bonds between parent and child, the social stigma or respect afforded a particular name within the community, and, where the child is of sufficient age, whether the child understands the significance of changing his name. *Id.*

All relevant factual circumstances must be evaluated to determine if a name change is in the child's best interest. No presumption exists in favor of either parent in contested name change proceedings. *Petition of Schidlmeier by Koslof,* 344 Pa. Super. 562, 496 A.2d 1249 (1985). One parent's hostile opposition to a name proposed by the other parent is not grounds for denying a name change petition. See *In re Brzostowski,* 42 D.&C.4th 454 (Northum. Cty. 1999). Father petitioned the court to change the child's surname from mother's maiden name to his when the child was 2 1/2 years old. Mother's sole reason for opposing name change was her animosity towards father.

A name change should be granted in absence of an objection to it, if such change will not be harmful to the rights of others or prejudicial to the public good. *In re Romm,* 77 D.&C. 481 (1951). However, any child has the right to change his or her name when he or she reaches the age of majority. *Id.*

The petitioning party must show why their name is better and in the best interests of the child. See *In re Name Change of C.R.C.,* 819 A.2d 558 (Pa. Super. 2003), where father's petition to change child's surname was denied. The court considered the fact that father stayed away from mother and child for a month after the child's birth and failed to arrange regular visitation thereafter.

In the present case, plaintiff had more than ample opportunity to provide names for the children before or immediately after their birth. He chose not to do so. In his absence and failure to act, the defendant named the children. The only alternative was to continue calling them Baby A, B and C.

The court specifically finds the use of non-legal names for the triplets by the plaintiff and those associated with him to be contrary to the best interests of the children. Using two sets of names will only lead to confusion and uncertainty for the children. By choosing to delay, plaintiff must now accept the names Matthew, Mark and Micah as the names of the children, and that they be addressed by those names. Plaintiff is also responsible for making sure that those around him address the children by their proper legal names.

As to the bond between plaintiff and his children, the court was alarmed at how plaintiff did not, and perhaps could not, refer to any child by any name. Given two sets of names, plaintiff did not even use one set to regularly refer to his children. This is unmistakable evidence that plaintiff has not bonded with or been involved with his children as much as he claims.

The court does recognize that plaintiff is partly responsible for the existence of the triplets and thus, his paternity should be acknowledged. Plaintiff indicated that he was dismayed at the defendant giving the children her last name. (Custody trial transcript, day 1, p. 51.) Defendant testified that she was agreeable to such a change. In order for the triplets to share some identity with their father, the court will order that the children's surname be changed from Bimber to Flynn.

The legal names of the triplets from now on will be Matthew, Mark and Micah Flynn. The birth certificates shall be amended accordingly. When they reach the age of majority, it will be up to the children alone to decide which names they wish to have. See *Romm, supra.*

(I) Cooperation Between Parents

By law, a court is required to consider which parent is more likely to encourage, permit and allow the other party frequent, continuing contact and access to the child. 23 Pa.C.S. §5303(2). Each parent's conduct in the presence of the child(ren) during custody exchanges is also a factor in determining whether the parent-child relationship is being encouraged or discouraged. See *Larrison v. Larrison,* 750 A.2d 895 (Pa. Super. 2000), where the court considered recording of mother swearing at father during a custody exchange as evidence against her fostering a positive relationship between the child and father.

Plaintiff has shown no ability or desire to cooperate with defendant in the long-term raising of these children. Rather, his intention is to deprive the children from contact with defendant, gain sole custody, and have "complete control" over the children and their care. (Custody trial transcript, day 1, p. 57.) "A modification of custody is not warranted merely because one parent is unhappy with the existing arrangement." *Jackson, supra* at 1252.

Plaintiff and Dr. Donich have assumed the worst about the defendant despite obvious evidence that the triplets have been well cared for by her. They were repeatedly described by witnesses at trial as happy, healthy, normal babies. (See testimony of Dawn Donich, Dr. Kurt Lund, and Amy Hokaj.) Plaintiff and Dr. Donich's complaints

regarding defendant's care of the children are trivial, at best, and insignificant in light of defendant's overall performance as a custodial parent.

Plaintiff testified that he sends no clothes, no toys, no gifts on special occasions, or other necessities to the children while they are in defendant's care. Conversely, defendant has provided plaintiff with food, clothing, medication and instructions for caring for the children. She has consistently provided an overnight bag on each of the children's visits, which returns unopened. (Custody trial transcript, day 1, pp. 235-36.)

Defendant has attempted to communicate with plaintiff in several ways and is often met with minimal response. Due to the lack of information she received about the children during their time with the plaintiff, defendant requested that a logbook be kept of their activities. She has also tried to instruct plaintiff and his paramour on how to install and use the children's car seats properly, how to administer a nebulizer medication for one, and given them an opportunity to learn the physical therapy exercises for another. (Custody trial transcript, day 1, pp. 225-38.)

Defendant and her husband have shown the ability to cooperate with plaintiff and to foster in the children respect and concern for him. As Douglas Bimber wisely testified, "Everybody needs to think about these boys, not themselves." (Custody trial transcript, day 2, p. 81, lines 5-6.) The court could not agree more.

### (J) Media Attention

There is no doubt that this case will continue to attract media attention for some time. As the triplets grow older,

they will very likely become aware of the statements their parents have made about each other, both in litigation and in the press. The court must address this issue now in light of the children's best and future interests.

It is apparent from statements they have made that plaintiff and Dr. Donich cling to the belief that defendant's involvement with the children is motivated solely by child support. (Custody trial transcript, day 1, p. 69, and day 2, pp. 36-37.) As plaintiff himself testified on direct examination, "We believe that if we do not give Danielle child support, she will give up the children." (Custody trial transcript, day 1, p. 69.)

Defendant has testified that she has been offered money from the national media to tell her story but she has refused. (Custody trial transcript, day 2, pp. 9-10.) In light of defendant's financial troubles, the court believes her refusal was both a difficult and admirable thing to do. This, as opposed to plaintiff's interview with a Cleveland-area newspaper, *The Plain Dealer,* in which he called the defendant "an opportunist" and was quoted as saying, "I have found a new level of hate." (John Horton, "Legal fight leaves triplets in limbo," *The Plain Dealer,* July 18, 2004.) Plaintiff admitted in his trial testimony that he made these statements. (Custody trial transcript, day 2, pp. 60-62.)

Defendant is not entirely without fault here in that she has also made statements to the press about the plaintiff and Dr. Donich. In particular she has been quoted as saying, "Something is wrong with these people." On cross-examination, defendant admitted that the statement "wasn't very nice." (Custody trial transcript, day 2, p. 10.) Plaintiff, on the other hand, refused to back down

from his statement that the defendant was an opportunist. (Custody trial transcript, day 2, p. 63.)

As to the issue of when the triplets will become aware of the media attention they have received, plaintiff and defendant were, not surprisingly, of two different minds. Defendant testified that she is "not going to hide this [the media coverage] from them" while plaintiff countered with "who is going to show it [the newspaper article] to them?" (Custody trial transcript, day 2, p. 9 and day 2, pp. 61-62.) Defendant's answer goes more toward the best interests of the children because it shows that she is willing to address any questions the triplets might have someday. Plaintiff's answer demonstrates that he would rather hide that information. With the advent of the Internet and technologically savvy generations of children, it is highly unlikely that the triplets will not uncover the media stories about them and their family. Plaintiff needs to be prepared to share that information with his children before they discover it for themselves.

While this court cannot order the parties to refrain from speaking with the press, it suggests that the parties keep in mind the best interests of their children when they do make public statements. One day the triplets will be able to read and see the news articles, which may in turn affect the way they see their parents.

## CONCLUSION

The court finds that the defendant should have primary custody of the triplets with liberal visitation by plaintiff. Defendant has shown that she is able, despite her economic status and smaller home, to care for the children and provide for all of their needs. Plaintiff has shown that he needs to work on his relationship with the

children, fostering a stronger connection to them, being able to confidently identify each child by name, and care for their needs, preferably without interference from his paramour. His request for sole custody because he is the biological father is denied at this time.

Given the unique circumstances of this case, the court finds the holding in *Commonwealth ex rel. Coburn v. Coburn,* 384 Pa. Super. 295, 558 A.2d 548 (1989), to be on point and very persuasive:

"[I]t cannot be in the best interests of the child to have this relationship cut off simply because there is no biological tie between them. Therefore, we find partial custody and visitation to be appropriate. In this era of artificial insemination, surrogate parenting and in-vitro fertilization, legal rights of a non-biological parent may become fixed by virtue of the parties' actions and the developmental relationship of the child with the parent. To permit one parent to revoke the parentage of the other parent, once those rights have been legally determined, in the absence of fraud, by invoking a blood test, invites chaos to the child's emotional well-being and legal status." At 305, 558 A.2d at 552-53.

Further, since the court has explicitly denied plaintiff's request for sole custody of the triplets, plaintiff is obligated to pay child support to defendant. An order for child support, based on the parties' stipulations at trial, was previously issued on September 17, 2004.

In the interest of judicial economy, this court granted plaintiff's motion for reconsideration on October 5, 2004, to allow the support and custody matters to be appealed at the same time per the requirements of Pa.R.C.P. 1930.2. Thus, the September 17, 2004 order for child support is hereby incorporated as part of this opinion and order.

The best interests of Matthew, Mark and Micah Flynn require that the following order of court regarding custody be entered consistent with the findings of the foregoing opinion.

## ORDER

And now, to wit, January 7, 2005, it is hereby ordered, adjudged and decreed that the following order shall be in effect until further order of court:

(1) The legal parents, James Flynn and Danielle Bimber, shall share legal and physical custody of their children. The names and birth dates are as follows:

Matthew Flynn, born November 19, 2003

Mark Flynn, born November 19, 2003

Micah Flynn, born November 19, 2003

(2) The children are to be addressed at all times by their legal names, Matthew, Mark and Micah Flynn. Father shall refer to the children by these names, and shall direct all those coming into contact with the children when in his partial custody to refer to the children by their legal names. Either parent's refusal to enforce this requirement will be considered as evidence of his lack of consideration of the best interests of the children and will be viewed as a violation of this provision.

(3) The children shall reside with their mother except that father shall have partial custody with their children as follows:

(a) Every Friday from 5 p.m. until Sunday at 5 p.m.

(b) Each parent is entitled to one, seven-day period of uninterrupted vacation upon 14 days notice to each other.

(c) Father shall have additional partial custody rights in Erie County, Pennsylvania, upon 48 hours notice to mother, upon mutual agreement.

(d) For Easter, 2005, the children shall be in the custody of their father. In even-numbered years, the children shall be in the custody of their mother.

(e) For Thanksgiving, 2005, custody shall be shared by the parties. The children shall be with their father from 12 noon Tuesday before the holiday until 12 noon Friday after the holiday. This will reverse in even-numbered years where mother shall have partial custody from 12 noon on Tuesday to 12 noon on Friday.

(f) For Christmas, 2005, custody shall be shared by the parties so that the children are with their mother on December 23 at 12 noon through December 25 at 12 noon, and with their father from December 25 at 12 noon through December 27 at 12 noon. This shall reverse in odd-numbered years.

(g) For all other holidays, upon mutual agreement, arrangements may be made for the non-custodial parent to visit in the hometown of the custodial parent, for a partial custody period of six hours.

(h) Each parent shall plan and celebrate the children's birthdays during their time of partial custody.

(i) The parent receiving the children shall provide transportation. Both parents shall provide age- and weight-appropriate car seats for the children.

(j) The children shall sleep independently in their own cribs.

(k) Each parent shall keep a log that shall be transferred with the children outlining each child's sleeping, eating, and toilet habits while in their care. Each parent

shall also record in the log any medical treatment or appointment that occurs while the children are in their care.

(l) The parents shall follow all doctors' recommendations and consult with each other about any and all medical concerns regarding the children. Each parent shall inform the other of any medical treatment or appointment within 48 hours of its occurrence and then document said appointment or treatment in the log.

(m) The parents shall communicate directly with each other by e-mail regarding the children. If e-mail is unavailable, the parties may use other means to communicate. Communication through third parties should only be used as a last resort.

(4) ALL HOLIDAY SCHEDULES SHALL SUPERCEDE ANY OTHER PARTIAL CUSTODY OR VISITATION SCHEDULE UNLESS THE PARTIES MUTUALLY AGREE TO DO OTHERWISE.

(5) Each parent shall keep the other informed of the children's health, progress in school, and general welfare and shall consult the other parent concerning major decisions affecting the children.

(6) Each parent is entitled to receive directly from schools, health care providers, or other relevant sources, information concerning their children.

(7) Neither parent shall engage in any conduct that presents to the children a negative or hostile view of the other.

(8) The parents shall refrain from arguing and name-calling during custody exchanges and in the presence of *any* children. This provision extends to third parties accompanying the parents on custody exchanges.

(9) Each parent shall encourage their children to comply with the custody arrangement and foster in their children a positive view of the other.

(10) This custody arrangement may be modified by an agreement of the parties when required for the best interest of the children. The term "mutual agreement" contemplates good faith discussions by both parents to reach an agreement as to specific dates and times of partial custody or visitation, and the unilateral determination of one parent to deny contact shall be viewed as a violation of this provision.

(11) If they have not already done so, the parents agree to attend the "Children Cope With Divorce" seminar.

(12) Jurisdiction of this matter shall remain in the Court of Common Pleas of Erie County, Pennsylvania, unless and until jurisdiction would change under the Uniform Child Custody Jurisdiction Act.

(13) VIOLATION OF THIS ORDER BY ANY PERSON MAY RESULT IN CIVIL AND CRIMINAL PENALTIES, INCLUDING PROSECUTION, PURSUANT TO SECTION 2904 OF THE PENNSYLVANIA CRIMES CODE, INTERFERENCE WITH CUSTODY OF CHILDREN.

## ORDER

On April 2, 2004, this court issued an interlocutory opinion and order finding that Danielle Bimber had standing to pursue child support and custody. On May 10, 2004, the court denied James Flynn's motion to permit appeal from that interlocutory order since the issues of support and custody were still pending.

A combined custody trial and support de novo hearing was held before this court on July 9 and 29, 2004. The parties informed the court at trial that they had reached an agreement as to the issue of child support.

On September 17, 2004, this court signed a final support order and stipulation. At that time, a final order on the issue of child custody had not been issued. On October 5, 2004, this court granted James Flynn's motion for reconsideration to avoid a separate appeal on the issue of support alone. In the foregoing opinion, the court incorporated the April 2, 2004 opinion and order on standing and the September 17, 2004 support order and stipulation as part of its final custody decision.

And now to wit, January 7, 2005, it is hereby ordered, adjudged and decreed that the issues of standing, child support and child custody have been determined by this court in the foregoing opinion and final orders. Pursuant to the requirements of Pa.R.C.P. 1930.2 and Pa. R.A.P. 901-911, all three matters may be taken up together on appeal in the interest of judicial economy.